Neil L. Henrichsen
NJ Bar ID No. 012931989
Henrichsen Law Group, P.L.L.C.
1725 I Street, N.W. Suite 300
Washington, DC 20006
(202) 423-3649 (telephone)
(202) 379-9792 (facsimile)
nhenrichsen@hslawyers.com
service@hslawyers.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
(NEWARK DIVISION)**

_____x

**LINDSEY GULDEN,**

**and**                                           **DOCUMENT
                                                  ELECTRONICALLY FILED**

**DAMIAN BURCH**                                  <u>**COMPLAINT**</u>


        Plaintiffs,


v.                                                Case No.

**EXXON MOBIL CORPORATION,**

        Defendant.
_____x

Plaintiffs **LINDSEY GULDEN** and **DAMIAN BURCH**, by and through their undersigned counsel, and by way of their Complaint against Defendant **EXXON MOBIL CORPORATION**, state as follows:

## **INTRODUCTION**

1.      Plaintiffs Lindsey Gulden, Ph.D. and Damian Burch, Ph.D. (collectively "Plaintiffs") timely filed a joint complaint against Exxon Mobil Corporation ("Exxon Mobil" or "Defendant") on February 10, 2021, under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A ("SOX"), alleging retaliation for engaging in SOX-related protected activity throughout 2019 and 2020.   Plaintiffs were terminated by Defendant for engaging in protected activity under SOX.

2.      Following an investigation by a duly authorized investigator, the Secretary of Labor, acting through his agent, the Regional Administrator for the Occupational Safety and Health Administration ("OSHA"), Region VI, on October 6, 2022, the Secretary of Labor (the "Secretary") issued a finding (the "Order") that there was reasonable cause to believe that Defendant violated SOX and communicated OSHA's reasonable belief that a violation of 18 U.S.C. § 1514A(a)(1)-(2) had occurred.   Exxon was provided with the opportunity to respond to the preliminary finding, which they did.

3.      On October 6, 2022, OSHA then released its final investigative findings and preliminary order in favor of Gulden and Burch, finding, in pertinent part, that

2

there was "reasonable cause to believe" that Exxon violated 18 U.S.C. § 1514A(a)(1)-(2) in terminating Gulden and Burch.  Gulden and Burch were also found to have suffered damages.

4.    The Order further states, *inter alia*, that upon receipt of the Secretary's Finding and Preliminary Order, Exxon Mobil "…shall immediately reinstate both Complainants [Plaintiffs] to their former positions. Such reinstatement shall include all salary, benefits, rights, and seniority that Complainants [Plaintiffs] would have enjoyed had they never been illegally discharged. Such reinstatement is not stayed by an objection to this order."

5.    Defendant then appealed the case to the Office of the Administrative Law Judges of the Department of Labor ("OALJ"), where it has been pending to date.

## JURISDICTION, VENUE AND PARTIES

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Furthermore, this action may be brought in this Court pursuant to 18 U.S.C. § 1514A (b)(1)(B) which provides that "if the Secretary has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to the bad faith of the claimant, [the claim can be pursued by] bringing an action at law or equity for de novo review in the appropriate district

3

court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy."

7.    More than 180 days have passed since claimants filed their complaint with the Secretary and the Secretary has not issued a final decision. Moreover, claimants have not acted in bad faith nor have claimants caused any delay.

8.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1).

9.    Dr. Lindsey Gulden is a citizen of the State of Massachusetts.

10.    Dr. Damian Burch is a citizen of the State of Texas.

11.    Defendant Exxon Mobil is a New Jersey Domestic Profit Corporation, originally incorporated in the State of New Jersey on August 5, 1882, and at all times relevant herein and currently, Defendant operated business in the State of New Jersey, including a research facility where Plaintiffs would at times work located at 1545 US Highway 22 E, Annandale, NJ 08801.

12.    Defendant is a publicly-traded energy company.

13.    The Secretary, through OSHA and OALJ, at all times prior to the filing of this Complaint, had jurisdiction over the Plaintiffs' complaint at issue herein pursuant to Section 806 of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(a)(1). Jurisdiction now rests with this Court.

## CAUSE OF ACTION FOR TERMINATION IN VIOLATION
## OF SARBANES-OXLEY 18 U.S.C. § 1514A

14.    The allegations in paragraphs 1–13 are incorporated herein by reference.

15.    Exxon Mobil holds a significant stake in the Delaware Basin, a geologic depositional and structural basin in West Texas and southern New Mexico known for holding large oil fields.

16.    During the relevant time period, Dr. Gulden was employed by Exxon Mobil in the position of Team Lead of the Global Business Lines Analytics and Optimization team within the Data Science and Optimization Section in the Digital Transformation group of Upstream Integrated Solutions. Dr. Gulden's responsibilities in that position included: (a) making analytic technical contributions when necessary; (b) building, managing, and executing a portfolio of projects in which analytics and optimization capability could assist decision makers in Upstream Oil and Gas; and (c) mentoring junior staff on her team in project scope and execution, stakeholder engagement, and other initiatives.

17.    During the relevant time period, Dr. Burch was employed by Exxon Mobil in the position of Development Planner in the Unconventional Development Planning group (the "Delaware Planning Team") in the Upstream Development Planning division of Exxon Mobil Global Projects. Dr. Burch's responsibilities in that position included: (a) simulating the long-term development of the Delaware

Basin, as well as other Exxon Mobil properties; (b) performing economic analyses of different development strategies for the Delaware Basin, as well as other Exxon Mobil properties; and (c) developing new strategies that could improve the economics of a property.

18.     In 2018, Exxon Mobil estimated that the net present value ("NPV") of its Delaware Basin holdings to be $60 Billion. The NPV estimate is a metric that describes the value of a particular development plan under certain economic assumptions. The core component of a development plan is the schedule of wells to be drilled and completed. The schedule is built using projected numbers of drilling rigs and fracking crews and best-guess assumptions for drilling speed and completion speed. NPV is calculated by discounting cash flow that is estimated by combining the development plan schedule, best guesses for oil and gas coming out of planned wells, cost calculations for development activities, and assumed commodity prices.

19.     While the level of activity of Exxon Mobil's drilling in the Delaware Basin increased in 2018 and 2019, the actual, real-world drilling speeds were still considerably slower than the 2018 estimates.

20.     During the 2019 planning and budget season for Exxon Mobil, the Delaware Development Planning Team revised the development plan for the Delaware Basin holdings using refined time-to-drill estimates generated by company

drilling experts and based on actual drilling speeds that had been measured over the prior year. Due largely to the slower-than-anticipated drilling times, the NPV estimate for the initial 2019 development plan was $40 Billion, $20 Billion less than the NPV estimate for the 2018 development plan.

21.    In April 2019, Defendant filed an SEC Form 8-k wherein it stated:

> ExxonMobil has revised its Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as early as 2024.  The size of the company's resource base in the Permian is approximately 10 billion oil-equivalent barrels and is likely to grow further as analysis and development activities continue.

22.    The said April 2019 SEC filing by Defendant conformed with then-recent public statements made to the investor community by Exxon Mobil's CEO, wherein Exxon Mobil pledged that it would increase oil and gas production in the Permian Basin, which includes the Delaware Basin, to one million barrels per day by 2024.

23.    However, the above-referenced representations and statements in paragraph 22 herein were based on the Exxon Mobil's 2018 development plan, and the revised drilling speeds that factored into the $40 Billion-NPV original 2019 development plan were well below the level needed to support Exxon Mobil's representations and statements to the public and SEC.

24.    To ensure conformity with these representations, Exxon Mobil placed significant pressure on the Delaware Development Planning Team to change the

development plan so that the 2019 NPV estimate would increase and so that production projections would be consistent with Exxon Mobil's representations and statements.

25.    After sharing the initial 2019 $40-Billion-NPV development plan with upper management, Exxon Mobil's Delaware Basin Development Manager, Melissa Bond ("Bond"), instructed the Delaware Planning Team to generate higher 2019 NPV estimates by revising the assumptions used to build the development plan in a way that would "claw back" value.

26.    When the use of revised, but still plausibly realistic, assumptions failed to significantly increase the Delaware Basin's NPV estimate and accelerate production projections, Bond decided to mandate the use of increasingly aggressive "drilling learning curve" assumptions.  The "drilling learning curve" assumptions refers to the assumption that drilling speeds will increase the longer a drilling crew stayed in a certain area.

27.    Bond dictated increasingly unrealistic learning curve assumptions until the NPV of the resulting Delaware development plan reached an estimated value of $50 Billion. However, by that point, the learning curve assumptions were fully inconsistent with Exxon Mobil's actual drilling speed data and with the learning assumptions from Exxon Mobil's drilling experts. Accordingly, such information was false.

28.     Several members of the Delaware Planning Team, including Dr. Burch, objected to the $50 Billion NPV estimate, because it was based on learning curve assumptions that were not supported by actual historical drilling speed data. Further, the learning curve assumptions were created post hoc by non-expert management, against the advice of the experts, and for the sole purpose of inflating the NPV estimate and production projections. Dr. Burch initially refused to use the learning curve assumption that generated that estimate because it was purposefully misleading. However, Bond insisted that it be used in the official estimate.

29.     As a data analytics professional, Dr. Gulden conducted her own study of whether the learning curve theory was supported by actual data. To perform the study, Dr. Gulden analyzed publicly available drilling-time data for more than 10,000 wells in the Delaware Basin, and observed that, while drilling times had fallen between the late 2000s and early 2010s, drilling times over the past several years remained essentially unchanged.

30.     In other words, there was no objective, verifiable support for Exxon Mobil's production estimates regarding the Delaware Basin wells and the underlying learning curve being utilized.

31.     Dr. Gulden forwarded the results of her study to Dr. Burch and the supervisor of the Delaware Development Planning team, Ozgur Ozen, in support of Dr. Burch's objections to Bond's chosen learning-curve assumption.

32.    On October 23, 2019, Bond held a Delaware Basin-wide meeting in which Dr. Burch was asked to present the Delaware Basin drilling plan based on the learning curve assumptions mandated by Bond.  Among those present at this meeting were the individuals who would be conducting the actual drilling.

33.    During the presentation, when Dr. Burch described the drilling speed and drilling learning curve assumptions that were used to generate the plan, one of the drillers listening to the presentation interrupted the presentation and stated, "That is impossible." Before Dr. Burch could respond, Bond told the audience that Dr. Burch must have made a mistake and that Dr. Burch, a mathematical modeling expert, did not understand mathematical modeling.

34.    Nevertheless, Bond did not seek any modification to the model.

35.    The true and correct forecast of oil production and cost of supply for Exxon Mobil's Delaware Basin holdings was not used by the Defendant in its public filings, which constitutes a violation of criminal fraud statutes, SEC rules and/or regulations, and Federal law relating to fraud against shareholders.

36.    Appalled that Bond was knowingly using false data to exaggerate drilling output, while blaming the person – Dr. Burch – who initially objected to the exaggerated assumption when other employees made similar objections, Dr. Gulden submitted an internal complaint on October 23, 2019 with Tanya Miller, a representative in Exxon Mobil's Human Resources Department.

37.     Shortly after Dr. Gulden's October 23, 2019 verbal complaint, Dr. Burch spoke with Ms. Miller and raised similar complaints regarding Bond's insistence on using false data to exaggerate drilling output. On November 14, 2019, at Ms. Miller's suggestion, Dr. Burch forwarded emails corroborating his assertions to Scott Clingman, Ms. Miller's supervisor in the Human Resources Department.

38.     Plaintiffs, by and through their respective complaints and objections as set forth herein, engaged in protected activity under SOX.

39.     Dr. Burch also wrote to Exxon Mobil's human resources department on November 14, 2019, stating, in pertinent part, that:

> our organization was misleading senior management this summer. Basically, they asked us to turn any knobs we could in our modeling software to get the forecasts NPV up, and (a) they didn't care whether or not those new assumptions were realistic (they weren't) and (b) they didn't make any changes that would be required to try to operationalize these new assumptions. The biggest offender was the "learning curve", which is an assumption that we'll more than double our drilling speed in the next five years.

40.     Dr. Gulden and Dr. Burch's complaints triggered an internal investigation that reached upper management. Upon information and belief, the investigation activities took place throughout 2020. However, neither Dr. Gulden nor Dr. Burch were informed of any conclusions rendered or actions taken by ExxonMobil in response to the investigation.

41.     On August 27, 2020, the Wall Street Journal ("WSJ") contacted Exxon

11

Mobil's Public & Government Affairs Department.  The WSJ was reaching out concerning an article it intended to publish regarding Exxon Mobil's development activities, expectations, and plans in the Delaware Basin.

42.    On September 13, 2020, an article was published in the Wall Street Journal entitled, "*Exxon Used to Be America's Most Valuable Company. What Happened?*" The article cited unnamed current and former employees for the contention that Exxon Mobil engineered an increase of 2019 NPV for the Delaware Basin from $40 Billion to $50 Billion by overestimating how quickly it could drill. That same assertion was the basis for Dr. Gulden and Dr. Burch's internal complaints in October and November 2019.

43.    Exxon Mobil initiated an investigation believing that both Dr. Gulden and Dr. Burch were sources of the said WSJ article and inquiry.

44.    In October 2020, Rick McGovern, an investigator in Exxon Mobil's Audit Department, notified Dr. Burch that he was under investigation for sending e-mails from his Exxon Mobil email account to his personal email account in July, 2020. Exxon Mobil's alleged reason for the investigation was unrelated to the subject of Dr. Burch's internal complaint and the WSJ article.

45.    During the initial investigative meeting, Dr. Burch explained to Mr. McGovern that the emails he sent to his personal e-mail account did not contain any proprietary or other company information. At the end of the initial investigative

meeting, Mr. McGovern told Dr. Burch that "the case is closed."

46.    Despite telling Dr. Burch that "the case is closed," the investigation into Dr. Burch by Defendant was not closed. Mr. McGovern subsequently requested additional data from Dr. Burch's computer and conducted a follow-up meeting with Dr. Burch. Mr. McGovern also told Dr. Burch that he (Dr. Burch) was prohibited from discussing the investigation with anyone else at or outside of Exxon Mobil. That instruction violated Exxon Mobil's written personnel policies, which sets forth a formal procedure for employees to discuss any employment-related concerns with Exxon Mobil management and Human Resources.

47.    Shortly after the initial investigative meeting with Mr. McGovern, Dr. Burch received a notification that his LinkedIn account had been viewed by Beth Casteel, the global head of the Audit Department. The global head of the Audit Department is several levels above Mr. McGovern within Defendant's organizational management.

48.    Someone in Mr. McGovern's position would normally be involved only in investigations of matters far more significant than the issue Mr. McGovern claimed was the basis for his investigation of Dr. Burch. Further, at approximately the same time, Dr. Gulden received a similar notification that Ms. Casteel had viewed her LinkedIn account as well, which indicated that Dr. Burch and Dr. Gulden were being scrutinized by the Defendant for a common reason.

49.    On October 23, 2020, just over one month after the publication of the WSJ article, Dr. Gulden was terminated by Exxon Mobil despite performing her job in a competent and professional manner. Exxon Mobil told Dr. Gulden that the reason for her termination was that management had lost confidence in her commitment to the Company and believed that her values were not aligned with those of the Company. Dr. Gulden was terminated in retaliation for her protected activity under SOX, including because Exxon Mobil believed Dr. Gulden was a source of the WSJ article information referenced herein.

50.    On December 10, 2020, Dr. Burch was terminated by Exxon Mobil, although Dr. Burch had also been performing his job in a competent and professional manner. Exxon Mobil told Dr. Burch that his termination was based partly on the investigation that commenced in October 2020. Specifically, Exxon Mobil stated that Dr. Burch was determined to have forwarded company files to his personal email address, and that he had modified as well as failed to disclose certain company documents during the investigation. Those allegations are false, as Exxon Mobil further admitted that they could not determine the nature of the files Dr. Burch allegedly forwarded to his email address. Dr. Burch did not forward any company files to his personal email address, did not modify any company documents except in the normal course of business, and did not withhold any company documents from the company in the course of its investigation. Accordingly, the alleged reasons for

Dr. Burch's termination by Exxon Mobil were pretextual.

51.    Exxon Mobil also told Dr. Burch that it was terminating him because he had cancelled one meeting with the investigators. However, Dr. Burch cancelled that meeting specifically to report retaliation to Exxon Mobil's Human Resources department.  Such reporting is required by Exxon Mobil's standards of business conduct in response to any retaliatory event.  Dr. Burch also sent the investigator an e-mail saying that he would continue to cooperate with the investigators after discussing the matter with Human Resources.

52.    Exxon Mobil's third stated reason for terminating Dr. Burch was because he allegedly did not cooperate with the investigation.  However, Dr. Burch fully complied with the investigation, providing the investigators with every piece of information they asked for, and voluntarily providing them with a company laptop of which the investigators were not aware.  In his last meeting with the investigators, Dr. Burch was asked for more information from his company computer.  Dr. Burch told the investigator that it would be easy to collect all of the newly requested information together, which he said he would do that weekend.  However, at the end of the meeting, Dr. Burch was suspended and his laptops were taken from him, making it impossible to continue to cooperate with the investigation.

53.    Finally, Exxon Mobil told Dr. Burch that it was terminating him because "it's become clear that you have some very negative sentiments from the

company strategy." However, the only company strategy about which Dr. Burch expressed negative sentiments was the decision to artificially inflate the value of the Delaware Basin by using impossible drilling speed assumptions.

54.    Dr. Burch was terminated in retaliation for his protected activity under SOX including because Exxon Mobil believed Dr. Burch was a source of the WSJ article information referenced herein.

55.    Plaintiffs are entitled to the protections of SOX because they each reported problems within Exxon Mobil as set forth herein involved the financial reporting of a publicly traded company.

56.    Plaintiffs filed a complaint with the Secretary of Labor through OSHA on February 10, 2021.

57.    ExxonMobil received notice of Plaintiffs' OSHA complaint through their Managing Counsel, Labor & Employment.

58.    During the investigative process, Exxon Mobil was afforded due process and ample opportunity to address the claims arising from Plaintiffs' OSHA complaint, as evidenced by the multiple responses submitted to OSHA by Exxon Mobil.

59.    On May 6, 2022, OSHA released its preliminary finding to Exxon Mobil that it had reasonable cause to believe ExxonMobil had violated Plaintiffs' rights under SOX.  Exxon Mobil was afforded an opportunity to respond to the

factual allegations contained therein.

60.    The May 6, 2022 preliminary finding of OSHA provided the following:

> Complainants [Plaintiffs] engaged in protected activity
> several times in 2019 when they addressed with
> Respondent's management their concerns with the
> assumptions leading to the estimated NPV of the Permian
> Basin and how these assumptions may have led to
> misleading statements in SEC filings.    Respondent
> [Defendant] was aware of the Complainant's protected
> activity and the evidence suggests such protected activity
> may have been a contributing factor in their terminations.
> However, Respondent claims that both Complainants
> were fired due to their suspected leak of company
> information to the Wall Street Journal.

> OSHA finds that if Complainants <u>did</u> provide information
> to the Wall Street Journal, it constitutes protected activity
> because the communication with the WSJ likely related to
> alleged violations of section 1341, 1343, 1344, 1348 or to
> any rule or regulation of the SEC or any Federal law
> relating to fraud against shareholders.    Further if
> Complainants <u>did not</u> provide information to the Wall
> Street Journal, they were still illegally fired because
> Respondent believed that Complainants were the WSJ's
> source and Respondent cannot lawfully terminate
> Complainant's employment because it suspected
> Complainants engaged in protected activity.

61.    Based on the above, among other things, OSHA advised Exxon Mobil

that it had "determined there is reasonable cause to believe that Exxon . . . has

violated the Sarbanes-Oxley Act (SOX), 18 U.S.C §1514A . . . ."

62.    Exxon Mobil responded on July 1, 2022 to the May 6, 2022 preliminary

finding.  Exxon Mobil was, therefore, afforded a fair and reasonable opportunity to

address OSHA's preliminary factual findings, as well as its ultimate finding.

63.     On October 6, 2022, OSHA released its final determination and preliminary order concerning Plaintiffs SOX claims.  OSHA concluded that Exxon Mobil had violated SOX and ordered that certain relief be afforded to Plaintiffs.

64.     Furthermore, the October 6, 2022 final determination required, inter alia, immediate reinstatement of the Plaintiffs by Exxon Mobil to their prior positions.

65.     In particular, the October 6, 2022 final determination stated as follows:

> Upon receipt of this Secretary's Finding and Preliminary Order, Respondent shall immediately reinstatement both Complainants to their former positions.  Such reinstatement shall include all salary, benefits, rights, and seniority that Complainants would have enjoyed had they never been illegally discharged.  Such reinstatement is not stayed by an objection to this order.

October 6, 2022 final determination at p. 8 (emphasis added).

66.     Section 42121 of Title 49 of the United States Code provides, in pertinent part, that:

> If the Secretary of Labor concludes that there is a reasonable cause to believe that a violation of subsection (a) has occurred, the Secretary shall accompany the Secretary's findings with a preliminary order providing the relief prescribed by paragraph (3)(B).  Not later than 30 days after the date of notification of findings under this paragraph, either the person alleged to have committed the violation or the complainant may file objections to the findings or preliminary order, or both, and request a hearing on the record.  The filing of such objections shall

18

> not operate to stay any reinstatement remedy contained in the preliminary order. . . . . If a hearing is not requested in such 30-day period, the preliminary order **shall be deemed a final order** that is not subject to judicial review.

49 .S.C. § 42121(b)(2)(A) (2023) (emphasis added).

67.    Exxon Mobil failed to file any motion to stay the preliminary reinstatement order of October 6, 2022.  Moreover, Exxon Mobil has been in violation of the October 6, 2022 preliminary reinstatement order and has rejected all attempts by Plaintiffs to obtain the ordered relief of preliminary reinstatement.

68.    The actual and/or suspected protected activity of Plaintiffs was a contributing factor in ExxonMobil's decision to terminate their employment, respectively.

69.    ExxonMobil's unlawful treatment of Plaintiffs as well as its refusal to fulfill the obligations it has pursuant to the October 6, 2022 preliminary reinstatement order relating to Plaintiffs is intentional and in reckless disregard of Plaintiffs' rights under law.

70.    Plaintiffs filed a related case in this Court, Case No. 3:22-cv-07418-MAS-TJB, regarding Defendant's failure to reinstate Plaintiffs.  That case is currently pending in the U.S. Court of Appeals for the Third Circuit, Case No. 23-1859.

71.    Despite the related case referenced in paragraph 70 herein, Plaintiffs were never reinstated by Defendant.

72.     As a direct and proximate result of the protected activities of Plaintiffs under SOX, Plaintiffs were terminated, a retaliatory personnel action, and have suffered, and continue to suffer, damages, including, but not limited to, lack of reinstatement by Defendant, loss of income, employment benefits, job advancement opportunities, mental anguish, emotional distress, personal humiliation, indignity, embarrassment, inconvenience, stigma, pain and suffering.

**WHEREFORE**, for good cause shown, Plaintiffs respectfully request that this Honorable Court grant judgment in their favor and against Defendant and for the following relief:

(A)     Reinstatement with the same seniority stats they would have if the discrimination had not occurred;

(B)     Back pay with interest including, but not limited to, lost wages, lost bonuses, lost pension benefits and other employment benefits;

(C)     Damages for mental anguish, emotional distress, personal humiliation, indignity, embarrassment, inconvenience, stigma, pain and suffering;

(D)     Special damages sustained and all other damages Plaintiffs may be entitled to under SOX;

(E)     An award of pre-judgment and post-judgment interest as well as all litigation costs, expert witness fees and attorney's fees; and

(F)     A grant of such other relief to Plaintiffs as this Court may deem fair and just.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated:  June 28, 2024                    Respectfully submitted,

                                         */s/Neil L. Henrichsen*
                                         Neil L. Henrichsen
                                         NJ Bar ID No. 012931989
                                         HENRICHSEN LAW GROUP, P.L.L.C.
                                         1725 I Street, N.W. Suite 300
                                         Washington, DC 20006
                                         (202) 423-3649
                                         (202) 379-9792 (facsimile)
                                         nhenrichsen@hslawyers.com
                                         *Attorneys for Plaintiffs*