**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| LINDSEY GULDEN | : | |
| | : | |
| and | : | Civil Action No. 3:24-CV-07381-MAS-TJB |
| | : | |
| DAMIAN BURCH, | : | |
| | : | **CERTIFICATION OF RICHARD J.** |
| Plaintiffs, | : | **CINO IN SUPPORT OF EXXON** |
| | : | **MOBIL CORPORATION'S MOTION** |
| v. | : | **TO DISMISS PLAINTIFFS'** |
| | : | **COMPLAINT** |
| EXXON MOBIL CORPORATION | : | |
| | : | |
| Defendant. | : | |

Richard J. Cino, of full age, certifies as follows:

1.      I am an attorney at law in the State of New Jersey and Principal at the law firm of Jackson Lewis P.C. I am one of the attorneys charged with defending this matter on behalf of Defendant Exxon Mobil Corporation ("ExxonMobil" or "Defendant"). As such, I am fully familiar with the facts set forth herein.

2.      I make this certification in support of ExxonMobil's motion to dismiss the Complaint of Plaintiffs Lindsey Gulden and Damian Burch ("Plaintiffs") pursuant to Federal Rule of Civil Procedure 12(b)(6).

3.      A true and accurate copy of Plaintiffs' February 10, 2021 Occupational Safety and Health Administration ("OSHA") Complaint is attached hereto as Exhibit A.

4.      A true and accurate copy of OSHA's October 6, 2022 Findings and Preliminary Order is attached hereto as Exhibit B.

5.      A true and accurate copy of Plaintiffs' December 20, 2022 Verified Complaint, filed in Civil Case No. 3:22-cv-07418, is attached hereto as Exhibit C.

6.      A true and accurate copy of the Honorable Michael A. Shipp's April 19, 2023 Order and Memorandum Opinion dismissing Plaintiffs' Verified Complaint for lack of jurisdiction is attached hereto as Exhibit D.

7.      A true and accurate copy of the Honorable Patrick M. Rosenow's August 28, 2023 Ruling denying Plaintiffs' motion to enforce reinstatement is attached hereto as Exhibit E.

8.      A true and accurate copy of the Administrative Review Board's February 29, 2024 Decision and Order denying Plaintiffs' interlocutory appeal is attached hereto as Exhibit F.

9.      A true and accurate copy of Plaintiffs' July 12, 2023 Bill of Particulars filed with the Office of Administrative Law Judges is attached hereto as Exhibit G.

10.      A true and accurate copy of the Honorable Patrick M. Rosenow's  April 11, 2024 Ruling on ExxonMobil's Motion to Unjoin and Dismiss Plaintiffs' Bill of Particulars is attached hereto as Exhibit H.

11.      A true and accurate copy of the Honorable Patrick M. Rosenow's July 2, 2024 Order dismissing Plaintiffs' administrative case is attached hereto as Exhibit I.


I certify under the penalty of perjury that the foregoing statements made by me are true. I am aware that if any are willfully false, I am subject to punishment.


*/s/ Richard J. Cino*
Richard J. Cino

Dated: October 14, 2024

4854-9042-1742, v. 1

# EXHIBIT A

U.S. DEPARTMENT OF LABOR
OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

LINDSEY GULDEN,

&

DAMIAN BURCH,

Complainants,

- against -

EXXON MOBIL CORPORATION,

Respondent.

_____/

**COMPLAINANTS' COMPLAINT**

OSHA CASE NO.

**TO:    Dallas Area Office**
**1100 East Campbell Road**
**Suite 250**
**Richardson, TX 75081**
**Via Overnight Mail**

**COME NOW** Complainants Lindsey Gulden ("Ms. Gulden") and Damian Burch ("Mr. Burch") (collectively referred to as "Complainants"), by and through their undersigned counsel, who hereby allege claims pursuant to Section 806 of the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A(a)(1) against Respondent, Exxon Mobil Corporation ("ExxonMobil" or the "Company" or "Respondent"), and state as follows:

**PARTIES AND JURISDICTION**

1.     Complainant Gulden, who is an adult female, is a resident of the State of Texas, City of Spring, and was regularly employed by ExxonMobil at all times relevant herein within the City of Spring, Texas.

1

2.     Complainant Burch, who is an adult male, is a resident of the State of Texas, City of Spring, and was regularly employed by ExxonMobil at all times relevant herein within the City of Spring, Texas.

3.     Respondent ExxonMobil, is a New Jersey corporation with headquarters in Irving, Texas.

4.     Complainants Gulden and Burch were terminated in retaliation for protected whistle-blower activities on October 23, 2020 and December 10, 2020, respectively. Complainants have timely filed this SOX Complaint within 180 days of the relevant adverse actions.

5.     The Occupational Safety and Health Administration, Department of Labor ("OSHA") has jurisdiction over the Complainants' complaint pursuant to Section 806 of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(a)(1).

### FACTUAL ALLEGATIONS AND CLAIM

6.     ExxonMobil is an American multinational oil and gas corporation and is a publicly traded company.

7.     ExxonMobil holds a significant stake in the Delaware Basin, a geologic depositional and structural basin in West Texas and southern New Mexico known for holding large oil fields.

8.     During the relevant time period, Ms. Gulden was employed by ExxonMobil in the position of Team Lead of the Global Business Lines Analytics and Optimization team within the Data Science and Optimization Section in the Digital Transformation group of Upstream Integrated Solutions. Ms. Gulden's responsibilities in that position included: (a) making analytic technical contributions when necessary; (b) building, managing, and executing a portfolio of projects in which analytics and optimization capability could assist decision makers in Upstream

2

Oil and Gas; and (c) mentoring junior staff on her team in project scope and execution, stakeholder engagement, and other initiatives.

9.     During the relevant time period, Mr. Burch was employed by ExxonMobil in the position of Development Planner in the Unconventional Development Planning group (the "Delaware Planning Team") in the Upstream Development Planning division of ExxonMobil Global Projects.  Mr. Burch's responsibilities in that position included:  (a) simulating the long-term development of the Delaware and other ExxonMobil properties; (b) performing economic analyses of different development strategies for the Delaware and other ExxonMobil properties; and (c) developing new strategies that could improve the economics of a property.

10.    In 2018, ExxonMobil estimated the net present value ("NPV") of its Delaware Basin holdings to be $60 Billion. The NPV estimate is a metric that describes the value of a particular development plan under certain economic assumptions. The core component of a development plan is the schedule of wells to be drilled and completed. The schedule is built using projected numbers of drilling rigs and fracking crews and best-guess assumptions for drilling speed and completion speed. NPV is calculated by discounting cash flow that is estimated by combining the development plan schedule, best guesses for oil and gas coming out of planned wells, cost calculations for development activities, and assumed commodity prices.

11.    Although the level of activity of ExxonMobil's drilling in the Delaware Basin increased in 2018 and 2019, actual, real-world drilling speeds turned out to be considerably slower than the 2018 estimates.

12.    During the 2019 planning and budget season, the Delaware Development Planning Team revised the development plan for the Delaware Basin holdings using refined time-to-drill estimates, generated by company drilling experts and based on actual drilling speeds that had been

3

measured over the past year. Due largely to the slower-than-anticipated drilling times, the NPV estimate for the initial 2019 development plan was $40 Billion, $20 Billion less than the NPV estimate for the 2018 development plan.

13.     In recent public statements to the investor community, ExxonMobil's CEO had pledged that ExxonMobil would increase oil and gas production in the Permian Basin, which includes the Delaware Basin, to one million barrels per day by 2024. However, those statements were based on the 2018 development plan, and the revised drilling speeds that factored into the $40 Billion-NPV original 2019 development plan were well below the level needed to support the CEO's statements.

14.     To ensure conformity with the CEO's public pledges regarding anticipated future oil and gas production, ExxonMobil placed significant pressure on the Delaware Development Planning Team to change the development plan so that the 2019 NPV estimate would increase and so that production projections would be consistent with the CEO's public pledges.

15.     After sharing the initial 2019 $40-Billion-NPV development plan with upper management, ExxonMobil's Delaware Basin Development Manager, Melissa Bond ("Bond"), instructed the Delaware Planning Team to generate higher 2019 NPV estimates by revising the assumptions used to build the development plan in a way that would "claw back" value.

16.     When the use of realistic revised assumptions failed to significantly increase the Delaware Basin's NPV estimate and accelerate production projections, Bond decided to mandate the use of increasingly aggressive "drilling learning curve" assumptions, which referred to the assumption that drilling speeds would increase the longer a drilling crew stayed in a certain area.

17.     Bond dictated increasingly optimistic learning curve assumptions until the NPV of the resulting Delaware development plan reached an estimated value of $50 Billion. However, by

4

that point, the learning curve assumptions were fully inconsistent with ExxonMobil's actual drilling speed data and with the learning assumptions from ExxonMobil's drilling experts. Accordingly, such information was false.

18.    Several members of the Delaware Planning Team, including Mr. Burch, objected to the $50 Billion NPV estimate, because it was based on learning curve assumptions that were not supported by actual historical drilling speed data. Further, the learning curve assumptions were specified post hoc by non-expert management, against the advice of the experts, for the sole purpose of inflating the NPV estimate and production projections. Mr. Burch initially refused to use the learning curve assumption that generated that estimate because it was purposefully misleading. However, Bond insisted that it be used in the official estimate.

19.    As a data analytics professional, Ms. Gulden conducted her own study of whether the learning curve theory was supported by actual data. To perform the study, Ms. Gulden analyzed publicly available drilling-time data for more than 10,000 wells in the Delaware Basin, and observed that, while drilling times had fallen between the late 2000s and early 2010s, drilling times over the past several years remained essentially unchanged. In other words, the learning curve theory has no support from recent historical drilling time data for ExxonMobil's Delaware Basin wells. Ms. Gulden forwarded the results of her study to Mr. Burch and the supervisor of the Delaware Development Planning team, Ozgur Ozen, in support of Mr. Burch's objections to Bond's chosen learning-curve assumption.

20.    On October 23, 2019, Bond held a Delaware Basin-wide meeting in which Mr. Burch was asked to present the Delaware Basin drilling plan based on the learning curve assumptions mandated by Bond. During the presentation, when Mr. Burch described the drilling speed and drilling learning curve assumptions that were used to generate the plan, one of the

drillers listening to the presentation interrupted the presentation and stated, "That is impossible." Before Mr. Burch could respond, Bond told the audience that Mr. Burch must have made a mistake and that Mr. Burch, a mathematical modeling expert, did not understand mathematical modeling. Nevertheless, Bond did not seek any modification to the model.

21.    The true and correct forecast of oil production and cost of supply for ExxonMobil's Delaware Basin holdings was not used by the Company in public filings, which constitutes a violation of criminal fraud statutes, SEC rules and/or regulations, and Federal law relating to fraud against shareholders.

22.    Appalled that Bond was knowingly using false data to exaggerate drilling output, while blaming the person – Burch – who initially objected to the exaggerated assumption when other employees made similar objections, Ms. Gulden submitted an internal complaint on October 23, 2019 with Tanya Miller, a representative in ExxonMobil's Human Resources Department.

23.    Shortly after Ms. Gulden's October 23, 2019 verbal complaint, Mr. Burch spoke with Ms. Miller and raised similar complaints regarding Bond's insistence on using false data to exaggerate drilling output. On November 14, 2019, at Ms. Miller's suggestion, Mr. Burch forwarded emails corroborating his assertions to Scott Clingman, Ms. Miller's supervisor in the Human Resources Department.

24.    Complainants, by and through their respective complaints and objections, engaged in protected activity under SOX.

25.    Ms. Gulden and Mr. Burch's complaints triggered an investigation that reached upper management. Upon information and belief, the investigation activities took place throughout 2020. However, neither Ms. Gulden nor Mr. Burch were informed of any conclusions rendered or actions taken by ExxonMobil in response to the investigation.

26.    On September 13, 2020, an article was published in the Wall Street Journal entitled, "*Exxon Used to Be America's Most Valuable Company. What Happened?*" The article cited unnamed current and former employees for the contention that ExxonMobil engineered an increase of 2019 NPV for the Delaware Basin from $40 Billion to $50 Billion by overestimating how quickly it could drill. That same assertion was the basis for Ms. Gulden and Mr. Burch's internal complaints in October and November 2019.

27.    In October 2020, Rick McGovern, an investigator in ExxonMobil's Audit Department, notified Mr. Burch that he was under investigation for sending e-mails from his ExxonMobil email account to his personal email account in July 2020. ExxonMobil's alleged reason for the investigation was unrelated to the subject of Mr. Burch's internal complaint and the Wall Street Journal article.

28.    During the initial investigative meeting, Mr. Burch explained to Mr. McGovern that the emails he sent to his personal e-mail account did not contain any proprietary or other company information. At the end of the initial investigative meeting, Mr. McGovern told Mr. Burch that "the case is closed."

29.    Despite telling Mr. Burch that "the case is closed," Mr. McGovern subsequently requested additional data from Mr. Burch's computer and conducted a follow-up meeting with Mr. Burch. Mr. McGovern also told Mr. Burch that he was prohibited from discussing the investigation with anyone else at or outside of ExxonMobil. That instruction violated ExxonMobil's written personnel policies, which sets forth a formal procedure for employees to discuss any employment-related concerns with ExxonMobil management and Human Resources.

30.    Shortly after the initial investigative meeting with Mr. McGovern, Mr. Burch received a notification that his LinkedIn account had been viewed by Beth Casteel, the global head

of the Audit Department. The global head of the Audit Department is several levels above Mr. McGovern's position and would normally be involved only in investigations of matters far more significant than the issue Mr. McGovern claimed was the basis for his investigation of Mr. Burch. Further, at approximately the same time, Ms. Gulden received a similar notification that Ms. Casteel had viewed her LinkedIn account as well, which indicated that Mr. Burch and Ms. Gulden were being scrutinized by the Company for a common reason.

31.     On October 23, 2020, just over one month after the publication of the Wall Street Journal article, Ms. Gulden was terminated by ExxonMobil despite performing her job in a competent and professional manner. ExxonMobil told Ms. Gulden that the reason for her termination was that management had lost confidence in her commitment to the Company and believed that her values were not aligned with those of the Company. Ms. Gulden was terminated in retaliation for her protected activity under SOX.

32.     On December 10, 2020, Mr. Burch was terminated by ExxonMobil, although Mr. Burch had also been performing his job in a competent and professional manner. ExxonMobil told Mr. Burch that his termination was based partly on the investigation that commenced in October 2020. Specifically, ExxonMobil stated that Mr. Burch was determined to have forwarded company files to his personal email address, and that he had modified as well as failed to disclose certain company documents during the investigation. Those allegations are false, as ExxonMobil further admitted that they could not determine the nature of the files Mr. Burch allegedly forwarded to his email address. Mr. Burch did not forward any company files to his personal email address, did not modify any company documents except in the normal course of business, and did not withhold any company documents from the company in the course of its investigation. Accordingly, the alleged reasons for Mr. Burch's termination by ExxonMobil were pretextual.

33.    ExxonMobil also told Mr. Burch that it was terminating him because he had cancelled one meeting with the investigators.  However, Mr. Burch cancelled that meeting specifically to report retaliation to ExxonMobil's Human Resources department.  Such reporting is required by ExxonMobil's standards of business conduct in response to any retaliatory event. Mr. Burch also sent the investigator an e-mail saying that he would continue to cooperate with the investigators after discussing the matter with Human Resources.

34.    ExxonMobil's third stated reason for terminating Mr. Burch was because he allegedly did not cooperate with the investigation.  However, Mr. Burch fully complied with the investigation, providing the investigators with every piece of information they asked for, and voluntarily providing them with a company laptop of which the investigators were not aware.  In his last meeting with the investigators, Mr. Burch was asked for more information from his company computer.  Mr Burch told the investigator that it would be easy to collect all of the newly requested information together, which he said he would do that weekend.  However, at the end of the meeting, Mr. Burch was suspended and his laptops were taken from him, making it impossible to continue to cooperate with the investigation.

35.    Finally, ExxonMobil told Mr. Burch that it was terminating him because "it's become clear that you have some very negative sentiments from the company strategy." However, the only company strategy about which Mr. Burch expressed negative sentiments was the decision to artificially inflate the value of the Delaware Basin by using impossible drilling speed assumptions.

36.    Mr. Burch was terminated in retaliation for his protected activity under SOX.

37.    Complainants are entitled to the protections of SOX.  Complainants' reporting of problems within ExxonMobil as set forth herein involved the financial reporting of a publicly

9

traded company.

38.    As a direct and proximate result of the protected activities of Complainants, Complainants were terminated, a retaliatory personnel action, and have suffered, and continue to suffer, damages, including, but not limited to, loss of income, employment benefits, job advancement opportunities, mental anguish, emotional distress, personal humiliation, indignity, embarrassment, inconvenience, stigma, pain and suffering.

**PRAYER FOR RELIEF**

**WHEREFORE**, Complainants Lindsey Gulden and Damian Burch respectfully request that the following relief be Ordered:

A.    Enter a declaratory judgment that ExxonMobil unlawfully violated Complainants' rights under law as well as an Order reinstating Complainants to their positions, or to equivalent positions, with ExxonMobil with all rights of seniority and benefits;

B.    Enter judgment in favor of Complainants against the Respondent on their SOX claims and award to Complainants and against Respondent any and all damages for lost income (back and front pay if necessary) and other employment benefits as well as all other economic damages allowed for under SOX;

C.    Enter an award to Complainants and against Respondent for all compensatory damages and other damages allowed for under SOX;

D.    Enter an award to Complainants and against Respondent for pre-judgment and post-judgment interest;

E.    Enter an award to Complainants and against Respondent for attorneys' fees, costs and disbursements associated with prosecution of this action; and

F.    Enter an award to Complainants and against Respondent for such additional relief

as deemed appropriate.

Dated: February 10, 2021                                     Respectfully Submitted,


/s/ Neil L. Henrichsen
Neil L. Henrichsen, DC Bar No. 420277
HENRICHSEN LAW GROUP, P.L.L.C.
1440 G Street, NW
Washington, DC 20005
Tele: (202) 423-3649
Fax: (202) 379-9792
nhenrichsen@hslawyers.com


/s/ Colin A. Thakkar
Colin A. Thakkar, FL Bar No. 0010242
HENRICHSEN LAW GROUP, P.L.L.C.
301 W. Bay Street, Suite 1400
Jacksonville, FL 32202
Tele: (904) 381-8183
Fax: (904) 212-2800
cthakkar@hslawyers.com


**Attorneys for Complainants**

# EXHIBIT B

**U.S. DEPARTMENT OF LABOR**

Occupational Safety and Health Administration
525 S. Griffin Street, Room 602
Dallas, TX 75202
Tel: (972) 850-4148
www.whistleblowers.gov



**VIA EMAIL:** Richard.Cino@jacksonlewis.com

October 6, 2022

Exxon Mobil Corporation
c/o Richard Cino, Esq.
Jackson Lewis P.C.
200 Connell Drive, Suite 2000
Berkeley Heights NJ 07922

Re: Exxon Mobil Corporation / Gulden and Burch/ 6-1730-21-120

Dear Mr. Cino:

This is to advise you that we have completed our investigation of the above-referenced complaint filed by Attorney Neil Henrichsen on behalf of his clients Dr. Lindsey Gulden, and Dr. Damian Burch (Complainants) against Exxon Mobil Corporation [1] ("ExxonMobil" or "Respondent") on February 10, 2021, under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A. In brief, Complainants allege retaliation for engaging in SOX-related protected activity throughout 2019 and 2020 and were terminated for Respondent's belief that Complainants provided information to a reporter at the Wall Street Journal (WSJ).

Following an investigation by a duly-authorized investigator, the Secretary of Labor, acting through his agent, the Regional Administrator for the Occupational Safety and Health Administration (OSHA), Region VI, finds that there is reasonable cause to believe that Respondent violated SOX and issues the following findings:

<strong>Secretary's Findings</strong>

*Timeliness of complaint*

On February 10, 2021, Complainants Dr. Lindsey Gulden and Dr. Damian Burch filed a complaint with the Secretary of Labor alleging Respondent retaliated against them in violation of SOX when Respondent terminated Dr. Gulden on October 23, 2020, and Dr. Burch on December 10, 2020, because they raised issues about the valuation of oil wells with Respondent's management, which they believed overinflated Respondent's SEC filings and information Respondent disclosed to the public. Since a Complainant has 180 days to file a complaint, the instant complaint is timely filed.

---

[1] . "Exxon Mobil Corporation" is the corporate name, but Respondent tends to refer to itself as "ExxonMobil" (This appears 255 times in their FY2021 10-K).

*Coverage*

Respondent is a company within the meaning of 18 U.S.C. § 1514A in that it is a company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l) or a company required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)).

Complainants were employees within the meaning of 18 U.S.C. § 1514A. In the course of their employment, Complainants worked as Computational Scientists.

*Findings of the investigation:*

ExxonMobil employed Dr. Lindsey Gulden as a Computational Scientist/Team Lead in Upstream Integrated Solutions. Dr. Gulden's responsibilities included making analytic technical contributions, building, managing, and executing a portfolio of projects in which analytics and optimization capability could assist decision-makers in the Upstream Oil and Gas division.

ExxonMobil employed Dr. Damian Burch as a Computational Scientist in Development Planning in Global Projects. Additionally, Dr. Burch assisted as the Development Planner in the Unconventional Development Planning Group (i.e., "Delaware Planning Team") in the Upstream Development Planning division of ExxonMobil Global Projects. Dr. Burch's responsibilities included simulating the long-term development of ExxonMobil properties, performing economic analyses of different development strategies, and developing new strategies that could improve the economics of a property.

On April 26, 2019, Respondent filed an SEC Form 8-K in which it claimed: "ExxonMobil has revised its Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as early as 2024. The size of the company's resource base in the Permian is approximately 10 billion oil-equivalent barrels and is likely to grow further as analysis and development activities continue." Dr. Gulden and Dr. Burch believed this statement was not accurate and they informed management about the misleading SEC filings.

The Complainants disagreed with the SEC filing because Dr. Gulden analyzed publicly available drilling-time data for more than 10,000 wells in the Delaware Basin[2] and observed that, while drilling times had fallen between the late 2000s and early 2010, drilling times over the past several years remained essentially unchanged. Dr. Gulden forwarded the results of her study to Dr. Burch and the supervisor of the Delaware Development Planning team, Mr. Ozgur Ozen. Dr. Gulden's study also supported Dr. Burch's objections to "learning curve assumptions" made by Melissa Bond, who was a Senior Manager in Respondent's Upstream Oil & Gas division. The "learning curve" was an assumption that drilling speed would increase substantially over the next five years. Complainants believed that this assumption was not accurate and was used to artificially inflate the production estimates and the Net Present Value (NPV) of the wells. Respondent then used the artificially inflated production estimates in their SEC filings.

---

[2] The Delaware Basin is a geologic depositional and structural basin in West Texas and southern New Mexico, it is part of the larger Permian Basin.

On June 18, 2019, Dr. Burch sent an email to the Delaware Basin Team, including Mr. Ozgur Ozen, with his results using assumptions with the learning curve modeling against assumptions without the learning curve modeling. Dr. Burch's analysis revealed a lower NPV than what the Respondent had disclosed publicly.

On June 19, 2019, Dr. Burch followed up on his June 18, 2019, email writing "I REALLY regret adding the learning curve to my model. Note that D&C learning is solely responsible for a 45% increase in our 2025 production forecasts in Rojo-Coyanosa. But remember, we're telling investors that no efficiency improvements are needed to reach our 2025 production target (though we're also telling investors that we don't have production targets)." Dr. Burch made it clear to management that he disagreed with the NPV analysis and believed Respondent was artificially inflating its oil production capacity to improve Respondent's public filings.

On October 23, 2019, during an all-hands meeting of the Delaware Basin Development Planning Team, Dr. Burch raised a concern about the Respondent's desire to reach projected oil production using assumptions in the learning curve modeling that would double drilling speed in the next five years. Dr. Burch did not believe this was supported by the models. Dr. Burch raised these concerns to Senior Manager Melissa Bond. Shortly after the meeting, Dr. Gulden reported to Respondent's Human Resources what she believed to be potential securities fraud surrounding the learning curve model(s) and what was reported to the public. Both Complainants raised issues with Respondent's analysis of oil production in the Delaware Basin. They believed it was artificially inflated and Respondent was misleading the public and the SEC in their filings. Both complainants expressed these concerns to management, and in doing so, they engaged in SOX-protected activity.

On November 14, 2019, Dr. Burch sent an email to the Respondent's Human Resources, which said: *"our organization was misleading senior management this summer. Basically, they asked us to turn any knobs we could in our modeling software to get the forecasts NPV* (Net Present Value) *up, and (a) they didn't care whether or not those new assumptions were realistic (they weren't) and (b) they didn't make any changes that would be required to try to operationalize these new assumptions. The biggest offender was the "learning curve", which is an assumption that we'll more than double our drilling speed in the next five years.".* Dr. Burch's email makes it clear that he was worried about the forecasted NPV and believed it to be inaccurate; he raised these issues multiple times with management, thus engaging in SOX-protected activity.

On August 27, 2020, the Wall Street Journal (WSJ) contacted ExxonMobil's Public & Government Affairs department (P&GA) regarding an article they intended to publish regarding the Company's development plans for the Permian Basin, in particular the Delaware Basin.

Following WSJ's notice of their forthcoming article, Beth Casteel, Respondent's Audit Team and Security Director immediately initiated an investigation into whether company information had been improperly disclosed to the WSJ. ExxonMobil identified employees who had worked with or had access to data related to the Delaware Basin. Respondent claimed it reviewed the electronic records for approximately 10 employees to determine if any of those employees sent company information outside the company. During the Audit Team's investigation, they singled out Dr. Gulden and Dr. Burch.

On September 9, 2020, Dr. Burch reported, via email, to his manager Charles Tautfest that he had received a text message the day prior from a reporter wanting to talk about the Delaware Basin. The next day, Dr. Burch notified the P&GA of the text message he received from the WSJ reporter.

On September 13, 2020, the WSJ article titled *"Exxon Used to Be America's Most Valuable Company. What Happened?"* was published.[3] The article identified that it had interviewed over 20 current and former employees. It named former ExxonMobil geoscientist, Enrique Rosero, who said he was punished for asking questions about the company's climate strategy. Mr. Rosero, who left the company on July 21, 2020, is Dr. Gulden's husband.

OSHA's interviews of Respondent's audit team revealed that the audit team told Michael Deal, Vice-President of the Upstream for Research Technology & Digital Development, that the Audit Team believed since Dr. Gulden's husband was quoted in the article she was "guilty" by association and probably assisted in the WSJ article.

On October 23, 2020, Dr. Gulden was terminated, a little over a month after the WSJ article was published.

Respondent reported to OSHA that the audit identified multiple large files that Dr. Burch had sent from his work computer to his personal email which were concerning to Respondent because of their size and subject headings (i.e., plots, figures, update figures, and decision plots). Respondent believed these files contained classified company information. However, during OSHA's interview with the lead audit team investigator, he admitted he was unable to ascertain what specifically was in the files. Dr. Burch denied he had sent any confidential information outside of the office and that, rather, the information Burch emailed to his personal address was used to prepare a white paper on a model dealing with valuing options for development planning.

On December 10, 2020, Dr. Burch was terminated for allegedly providing company information to the WSJ, not fully cooperating in the internal investigation surrounding the article, and transferring company information to his personal email account.  Dr. Burch denied sending any confidential information to his personal email.

### *Respondent's Defense*

Respondent asserted employees are required to protect company assets and are prohibited from disclosing company information. Respondent further asserts that all employees must certify each year that they have read and complied with these standards, which both Dr. Gulden and Dr. Burch executed. As employees and IT users, Burch and Gulden were subject to ExxonMobil's Key IT User Responsibilities guidance, including:

1. Company information and systems on any computer, mobile device, and/or network are the property of ExxonMobil.
2. ExxonMobil monitors the use of its systems to detect security problems, mitigate IT

---

[3] Available at: https://www.wsj.com/articles/exxon-used-to-be-americas-most-valuable-company-what-happened-oil-gas-11600037243

    security risks, detect and prevent unauthorized transmission of Company data or personal information, ensure proper use of systems …

3. Failure to follow the Key IT User Responsibilities guidance may result in possible irregularity investigation and disciplinary action up to and including termination.

Respondent asserted that an investigation was initiated in August 2020 and that the investigation was not related to any alleged 2019 complaints by Complainants.  Respondent claims the investigation was triggered after Respondent was contacted by a reporter from the WSJ informing ExxonMobil of its plan to publish an article regarding, among other things, the company's development of its Permian assets. Respondent claims that it terminated both Complainants as a result of its findings from the internal investigation.

Respondent asserted Dr. Gulden was among the small group of individuals who worked with or had access to Delaware Basin data referred to in the WSJ article. Moreover, Dr. Gulden was married to Rosero, who was quoted in the article. As a result, in August 2020 ExxonMobil identified Dr. Gulden as someone who may have disclosed Company information and began a review of her electronic communications. In doing so, an audit identified communications in which Gulden had expressed negative opinions about the company. The audit also discovered emails Gulden had prepared[4] to individuals at other companies in pursuit of alternative employment. The emails were all dated around the time that ExxonMobil was contacted by the WSJ and the publication of the WSJ article. ExxonMobil was faced with the prospect of continuing to employ an individual who was the spouse of the former employee quoted in the WSJ article, who had expressed negative sentiments about the company, and who would continue to have access to sensitive company information, all while apparently seeking employment elsewhere. As a result, ExxonMobil alleges that it lost confidence in Gulden as an employee and terminated her employment on October 23, 2020.

On September 3, 2020, Respondent's audit identified multiple large files Burch had sent from his work computer to his personal email address. Exxon alleges the emails were of particular concern given both the size of the files and the file names which appeared to correspond to some of the topics in the WSJ article. For example, during the period between June 14 and July 4, 2020, Dr. Burch sent approximately 6.5 MB of data to his personal email address. The emails had subject headings including "Plots," "Figures," "Updated Figures," and "Decision Plot." A number of the files attached to the emails had names containing words that indicated the information in the files pertained to ExxonMobil work, including "WELL_NET_CASH_FLOW," "WELL_DECLINE_CURVE," and "WELL_CASH_STREAMS."

On September 9, 2020, Dr. Burch emailed his manager, Charles Tautfest, advising him that he received a "weird text" message the prior day from a WSJ reporter wanting to talk about the Delaware Basin. Dr. Burch said he deleted the text. The next day, Dr. Burch notified P&GA of the reporter's text.

In conversations with the WSJ reporter Respondent claimed that the reporter had access to Dr. Burch's emails containing spreadsheets with Permian projections. Respondent alleged the reporter also made other comments indicating he had information from Dr. Burch.

---

[4] It is unclear if the emails were ever sent.

Respondent theorized that Dr. Burch sent emails outside the company's network to his personal email address shortly before the WSJ article was published and gave the data to the reporter. According to Respondent, the emails Dr. Burch sent to his personal email address appeared to contain information related to his Delaware Basin work. Neither Respondent nor Dr. Burch could prove what was in the files. Dr. Burch alleged the emails did not contain company data but could not substantiate his claim because he deleted the files. Respondent alleges that, in addition to deleting and modifying files during the course of the company's investigation, Dr. Burch did not fully cooperate with the investigation. Respondent alleges Dr. Burch provided incomplete answers and inconsistent responses. Respondent contends that in meetings with the audit team and in light of the information provided, the company terminated Dr. Burch's employment on December 10, 2020.

### Due Process

On May 6, 2022, OSHA sent a letter to Respondent, pursuant to 29 C.F.R. §1980.104(f), advising Respondent that OSHA has reasonable cause to believe that Respondent violated SOX when it terminated both Complainants. The letter further advised that Respondent had failed to provide clear and convincing evidence that it would have taken the same adverse actions in the absence of protected activity. The letter afforded Respondent an opportunity to submit rebuttal evidence.

On July 1, 2022, Respondent responded to the §1980.104(f) letter asserting that Complainants had failed to establish that they had engaged in activity protected by SOX that contributed to their terminations and that, in any event, Respondent would have terminated Complainants due to the results of the internal investigation even absent any protected activity.  Respondent's position rests primarily on its argument that disclosures to the media are not a protected activity under SOX, citing *Tides v. Boeing, Co.,* 644 F.3d 809 (9th Cir. 2011). While OSHA reviewed Respondent's submissions on the matter and analyzed their various arguments, OSHA believes Respondent's submissions did not demonstrate by clear and convincing evidence that the adverse action would have occurred absent the protected activity.  Neither Complainant had any disciplinary history and both had exemplary work records.  The evidence shows that neither Complainant was in danger of any disciplinary action, much less losing their job until Respondent suspected them of providing information to the WSJ.

### Analysis

Respondent claims that the leading case regarding whether providing information to the media constitutes protected activity under SOX is *Tides v. Boeing, Co.,* 644 F.3d 809 (9th Cir. 2011). But in that case, the Ninth Circuit held that employees' communications with the news media were not protected activities under section 806(a)(1) of SOX. The Court *did not address* whether communications with the media are protected under section 806(a)(2) of SOX.

Moreover, the Administrative Review Board (ARB or the Board) has consistently interpreted other whistleblower provisions with language virtually identical to that found in section 806(a)(2) as protecting from retaliation an employee's communications with the news media that could result in the exposure of employer wrongdoing. In reaching this conclusion, the Board has reasoned that the whistleblower protection provisions encompass not only the actual institution of formal proceedings but also communications with the news media about employer wrongdoing since such communications essentially are the first step in a process that could result in the initiation of formal proceedings.

Therefore, consistent with the Secretary's interpretation of virtually identical language in the other whistleblower statutes, OSHA concludes that section 806(a)(2) of SOX protects an employee's communications with the news media relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders. Here, Complainants engaged in protected activity several times in 2019 and 2020 when they raised their concerns to Respondent's management that the assumptions leading to the estimated NPV of the Permian Basin were inaccurate and how those assumptions were included in misleading statements in SEC filings. These concerns were ultimately the subject of the 2020 WSJ article and a subsequent lawsuit alleging shareholder fraud. Complainants had a reasonable belief that the Respondent's statements in their SEC filings were inaccurate.  Complainants raised these concerns internally and Respondent was aware of this protected activity.

Further, based on the record as a whole, OSHA finds that Respondent's belief that Complainants provided information to the WSJ, alleged violations of section 1341, 1343, 1344, 1348 or any rule or regulation of the SEC or any Federal law relating to fraud against shareholders, contributed to Respondent's termination of Complainants' employment.  Though Respondent asserts that it terminated Complainants based on the findings of Respondent's internal investigation, that internal investigation was launched and ultimately narrowed to focus on Complainants due to their suspected communications with the WSJ.

Respondent has failed to provide clear and convincing evidence that it would have taken the same adverse action in the absence of Complainants' actual or suspected protected activity. As noted above, although Respondent asserts that it fired Complainants based on the findings of its internal investigation, Respondent has failed to show that it would have even investigated Complainants (much less fired them) in the absence of Respondent's suspicion that Complainants provided information to the WSJ.  While Respondent claimed that other employees could be disciplined for improper use and disclosure of Company information, they did not provide any evidence that other employees had ever been disciplined for the violation. Therefore, OSHA has reasonable cause to believe that Respondent violated the whistleblower provision of SOX and Complainants are entitled to relief.

Complainants suffered financial hardship and mental anguish because Respondent illegally retaliated against them in violation of SOX. The terminations were devastating for Complainants, who are high-level professionals, neither of whom had ever been terminated from a position. Complainant Gulden had to move her family to Massachusetts in order to find suitable work. Complainant Burch experienced stress related to the retaliatory actions of Respondent and was forced to seek treatment. Both Complainants' family members suffered anxiety and stress due to the actions of Respondent. Compensatory damages for pain and suffering are warranted.

# PRELIMINARY ORDER

1. Upon receipt of this Secretary's Finding and Preliminary Order, Respondent shall immediately reinstate both Complainants to their former positions. Such reinstatement shall include all salary, benefits, rights, and seniority that Complainants would have enjoyed had they never been illegally discharged. Such reinstatement is not stayed by an objection to this order.

### Dr. Gulden

2. Respondent shall pay Dr. Gulden back pay (minus interim earnings) in the amount of $240,727.77, for the period starting October 24, 2020, through October 6, 2022. Back wages will continue to accrue until paid.

3. Respondent shall pay Dr. Gulden interest on the back wages totaling $9,009.45 at the IRS underpayment rate at 26 U.S.C. § 6621, compounded daily as of October 6, 2022. Interest on any unpaid amount of back wages will continue to accrue until paid.

4. Respondent shall pay Dr. Gulden compensatory damages in the amount of $144,338.05, for the following:

   - Moving expenses from Texas to Massachusetts in the amount of $21,039.44
   - Travel and job-hunting expenses in the amount of $3,000.00
   - Pecuniary damages surrounding Respondent's 401K matching contribution for years 2020, 2021, and 2022 of $45,298.61 which includes interest as of October 6, 2022
   - Pain and suffering, including mental distress of $50,000.00
   - Return moving expenses from Massachusetts to Texas in the amount of up to $25,000.00, with Dr. Gulden submitting receipts for actual costs.[5]

5. Respondent shall submit the appropriate documentation to the Social Security Administration allocating back pay to the appropriate calendar days of October 24, 2020, through October 6, 2022.

6. Respondent shall pay reasonable attorney's fees.

7. Respondent shall expunge Complainant's employment records of any reference to the exercise of her rights under SOX. Specifically, Respondent shall expunge the termination of October 23, 2020.

### Dr. Burch

8. Respondent shall pay Dr. Burch back pay (minus interim earnings) in the amount of $251,099.20, for the period starting December 11, 2020, through October 6, 2022. Back wages will continue to accrue until paid.

---

[5] Payable if Complainant accepts reinstatement.

9. Respondent shall pay Dr. Burch interest on the back wages in the amount of $7,462.22 at the IRS underpayment rate at 26 U.S.C. § 6621, compounded daily, as of October 6, 2022. Interest on any unpaid amount of back wages will continue to accrue until paid.

10. Respondent shall pay Dr. Burch compensatory damages in the amount of $114,971.91, for the following:

   - Medical expenses of $5,000.00
   - Pain and suffering including mental distress of $25,000.00
   - 700 unvested shares in ExxonMobil at $53.98 a share at the time of his termination worth $37,786.00
   - Pecuniary damages surrounding Respondent's 401K matching contribution for years, 2020, 2021, and 2022 of $47,185.91 which includes interest as of October 6, 2022.

11. Respondent shall reinstate Dr. Burch's right to exercise stock options pursuant to Respondent's policy. Dr. Burch's enrolment shall be deemed to have been continuous for purposes of vesting requirements.

12. Respondent shall submit the appropriate documentation to the Social Security Administration allocating back pay to the appropriate calendar days of October 24, 2020, through October 6, 2022.

13. Respondent shall expunge Complainant's employment records of any reference to the exercise of his rights under SOX. Specifically, Respondent shall expunge the termination of December 11, 2020.

14. Respondent shall pay reasonable attorney's fees.

**Other Relief**

15. Respondent shall expunge Complainants' employment records of any reference to the exercise of their rights under SOX.  Respondent shall ensure that the facts and circumstances related to this complaint are not used against Complainants to deny them any future opportunities with the Respondent and that no negative references relating to the facts and circumstances related to this complaint are provided to any prospective future employers.  Respondent shall expunge all records of Complainants' termination from their personnel record.

16. Respondent shall not retaliate or discriminate against Complainants in any manner for instituting or causing to be instituted any proceeding under or related to the Sarbanes-Oxley Act, 18 U.S.C.A. §1514A.

17. Respondent shall post immediately in a conspicuous place in or about Respondent's facility located at 2777 Springwoods Village Parkway, N1.4B.478, Spring, TX 77389, in all places where notices for employees are customarily posted, including Respondent's internal website for employees or by e-mail, if Respondent customarily uses one or more of these electronic methods for communicating with employees, and maintain for a period of at least 60

consecutive days from the date of posting the attached notice to employees, to be signed by a responsible official of Respondent and the date of actual posting to be shown thereon.

Either party has 30 days from the receipt of these Findings to file objections and to request a hearing before an Administrative Law Judge (ALJ). If no objections are filed, these Findings will become final and not subject to court review. Objections must be filed in writing with the Office of Administrative Law Judges:

> Primary method - via email to: OALJ-Filings@dol.gov
> Secondary method (if unable to file via email) - via hard copy submission to:
> Chief Administrative Law Judge - Office of Administrative Law Judges
> U.S. Department of Labor
> 800 K Street NW, Suite 400 North
> Washington, D.C. 20001-8002
> Telephone: (202) 693-7300; Fax: (202) 693-7365

With copies to:

> All parties to this complaint.

And:

> Primary method - via email to: R6.11c.OSHA@dol.gov
> Secondary method (if unable to file via email) - via hard copy submission to:
> Regional Administrator
> U.S. Department of Labor-OSHA
> 525 S. Griffin Street
> Room 602
> Dallas, TX 75202

In addition, please be advised that the U.S. Department of Labor generally does not represent any party in the hearing; rather, each party presents his or her own case. The hearing is an adversarial proceeding before an Administrative Law Judge (ALJ) in which the parties are allowed an opportunity to present their evidence de novo for the record. The ALJ who conducts the hearing will issue a decision based on the evidence, arguments, and testimony presented by the parties. A review of the ALJ's decision may be sought from the Administrative Review Board, to which the Secretary of Labor has delegated responsibility for issuing final agency decisions under the SOX. A copy of this letter has been sent to the Chief Administrative Law Judge along with a copy of the complaint. The rules and procedures for the handling of SOX cases can be found in Title 29, Code of Federal Regulations Part 1980, and may be obtained at www.whistleblowers.gov

Sincerely,

Michael Mabee
Assistant Regional Administrator - Whistleblower Protection Program

**Exxon Mobil Corporation / Gulden and Burch/ 6-1730-21-120**                                           **11**

Enclosure: Notice to Employees

cc:      Chief Administrative  Law Judge, USDOL

         U.S. Securities and Exchange Commission

         U. S. Department of Justice, Civil Frauds Division

         Neil Henrichsen, Esq.
         Henrichsen Law Group P.L.L.C.
         301 W. Bay Street, Suite 1400 (14th Floor)
         Jacksonville, FL 32202
         VIA EMAIL: nhenrichsen@hslawyers.com



# NOTICE TO EMPLOYEES

## PURSUANT TO AN ORDER BY THE U.S. DEPARTMENT OF LABOR, OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION:

**EXXON MOBIL CORPORATION** has been ordered to reinstate and make whole two employees who were found to have been retaliated against for exercising their rights under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A (SOX).

**PURSUANT TO THAT ORDER, NEITHER EXXON MOBIL CORPORATION NOR ANY OF ITS SUBSIDIARIES WILL:**

1.  Discharge or in any manner discriminate against any employee because such employee has engaged in any activity, filed any complaint or instituted or caused to be instituted any proceeding under or related to the employee protection provisions of Section 806 of the Corporate and Criminal Fraud Accountability Act, Title VII of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1514A (SOX), or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself/herself or others of any right afforded by SOX.

2.  Discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee because such employee provided information, caused information to be provided, or otherwise assisted in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of 18 U.S.C. section 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), or 1348 (securities fraud), any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

3.  Harass, intimidate or retaliate against employees because such employees contacted, spoke with, or cooperated with Occupational Safety and Health Administration (OSHA) officials or other government officials during the course of an investigation.

_____
Exxon Mobil Corporation                                    Date

**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE. THIS NOTICE MUST REMAIN POSTED FOR 180 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST BE NOT ALTERED, DEFACED, OR COVERED BY OTHER MATERIAL.**



# EXHIBIT C

Neil L. Henrichsen
NJ Bar ID No. 012931989
Henrichsen Law Group, P.L.L.C.
655 15th Street, N.W. Suite 800
Washington, DC 20005 (202) 999-8998
(202) 423-3649 (telephone)
(202) 379-9792 (facsimile)
nhenrichsen@hslawyers.com
service@hslawyers.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____x

**LINDSEY GULDEN,**

**And**                                                          **DOCUMENT**
                                                                **ELECTRONICALLY FILED**

**DAMIAN BURCH**                                       **VERIFIED COMPLAINT**
                                                                **SEEKING ENFORCEMENT**
                                                                **OF AN ORDER OF THE**
                                                                **SECRETARY OF LABOR**
                                                                **FOR REINSTATEMENT**

     Plaintiffs,


v.                                                                Case No.

**EXXON MOBIL CORPORATION,**

     Defendant.
_____x

Plaintiffs **LINDSEY GULDEN** and **DAMIAN BURCH**, by and through their undersigned counsel, and by way of their Verified Complaint Seeking Enforcement of An Order of the Secretary of Labor For Reinstatement against Defendant **EXXON MOBIL CORPORATION**, state as follows:

## INTRODUCTION

1.   Plaintiffs Lindsey Gulden, Ph.D. and Damian Burch, Ph.D. (collectively "Plaintiffs") timely filed a joint complaint against Exxon Mobil Corporation ("Exxon Mobil" or "Defendant") on February 10, 2021, under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A ("SOX"), alleging retaliation for engaging in SOX-related protected activity throughout 2019 and 2020.   Plaintiffs were terminated by Defendant for engaging in protected activity under SOX.

2.   Following an investigation by a duly-authorized investigator, the Secretary of Labor, acting through his agent, the Regional Administrator for the Occupational Safety and Health Administration ("OSHA"), Region VI, on October 6, 2022, the Secretary of Labor (the "Secretary") issued a finding (the "Order") that there was reasonable cause to believe that Defendant violated SOX.

3.   The Order further states, *inter alia*, that upon receipt of the Secretary's Finding and Preliminary Order, Exxon Mobil "…shall immediately reinstate both Complainants [Plaintiffs] to their former positions. Such reinstatement shall include all salary, benefits, rights, and seniority that Complainants [Plaintiffs] would have

2

enjoyed had they never been illegally discharged. Such reinstatement is not stayed by an objection to this order."

4. Defendant has refused to date to reinstate Plaintiffs.

## **JURISDICTION AND VENUE**

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Furthermore, SOX provides pursuant to 29 C.F.R. § 1980.113, in pertinent part, as follows: "…Whenever any person has failed to comply with a preliminary order of reinstatement, or a final order, including one approving a settlement agreement, issued under the Act [SOX], a person on whose behalf the order was issued may file a civil action seeking enforcement of the order in the appropriate United States district court."

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1).

## **PARTIES**

7. Dr. Lindsey Gulden is a citizen of the State of Massachusetts.

8. Dr. Damian Burch is a citizen of the State of Texas.

9. Defendant Exxon Mobil is a New Jersey Domestic Profit Corporation, originally incorporated in the State of New Jersey on August 5, 1882, and at all times relevant herein and currently, Defendant operated business in the State of New Jersey, including a research facility where Plaintiffs would at times work located at 1545 US Highway 22 E, Annandale, NJ 08801.

3

10.     Defendant is a publicly-traded energy company.

11.     The Secretary, through OSHA, at all times, had jurisdiction over the Plaintiffs' complaint at issue herein pursuant to Section 806 of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(a)(1).

## FACTUAL BACKGROUND SUPPORTING ENFORCEMENT OF REINSTATEMENT ORDER

12.      Exxon Mobil holds a significant stake in the Delaware Basin, a geologic depositional and structural basin in West Texas and southern New Mexico known for holding large oil fields.

13.     During the relevant time period, Dr. Gulden was employed by Exxon Mobil in the position of Team Lead of the Global Business Lines Analytics and Optimization team within the Data Science and Optimization Section in the Digital Transformation group of Upstream Integrated Solutions. Dr. Gulden's responsibilities in that position included: (a) making analytic technical contributions when necessary; (b) building, managing, and executing a portfolio of projects in which analytics and optimization capability could assist decision makers in Upstream Oil and Gas; and (c) mentoring junior staff on her team in project scope and execution, stakeholder engagement, and other initiatives.

14.     During the relevant time period, Dr. Burch was employed by Exxon Mobil in the position of Development Planner in the Unconventional Development Planning group (the "Delaware Planning Team") in the Upstream Development

4

Planning division of Exxon Mobil Global Projects. Dr. Burch's responsibilities in that position included: (a) simulating the long-term development of the Delaware and other Exxon Mobil properties; (b) performing economic analyses of different development strategies for the Delaware and other Exxon Mobil properties; and (c) developing new strategies that could improve the economics of a property.

15.    In 2018, Exxon Mobil estimated the net present value ("NPV") of its Delaware Basin holdings to be $60 billion. The NPV estimate is a metric that describes the value of a particular development plan under certain economic assumptions. The core component of a development plan is the schedule of wells to be drilled and completed. The schedule is built using projected numbers of drilling rigs and fracking crews and best-guess assumptions for drilling speed and completion speed. NPV is calculated by discounting cash flow that is estimated by combining the development plan schedule, best guesses for oil and gas coming out of planned wells, cost calculations for development activities, and assumed commodity prices.

16.    Although the level of activity of Exxon Mobil's drilling in the Delaware Basin increased in 2018 and 2019, actual, real-world drilling speeds turned out to be considerably slower than the 2018 estimates.

17.    During the 2019 planning and budget season, the Delaware Development Planning Team revised the development plan for the Delaware Basin

5

holdings using refined time-to-drill estimates, generated by company drilling experts and based on actual drilling speeds that had been measured over the past year. Due largely to the slower-than-anticipated drilling times, the NPV estimate for the initial 2019 development plan was $40 billion, $20 billion less than the NPV estimate for the 2018 development plan.

18.     In public statements to the investor community, Exxon Mobil's CEO had pledged that Exxon Mobil would increase oil and gas production in the Permian Basin, which includes the Delaware Basin, to one million barrels per day by 2024. However, those statements were based on the 2018 development plan, and the revised drilling speeds that factored into the $40 billion-NPV original 2019 development plan were well below the level needed to support the CEO's statements.

19.     To ensure conformity with the CEO's public pledges regarding anticipated future oil and gas production, Exxon Mobil placed significant pressure on the Delaware Development Planning Team to change the development plan so that the 2019 NPV estimate would increase and so that production projections would be consistent with the CEO's public pledges.

20.     On various occasions, Plaintiffs objected to the false public statements of Exxon Mobil concerning anticipated future oil and gas production.

21.     On September 13, 2020, an article was published in the Wall Street Journal entitled, "*Exxon Used to Be America's Most Valuable Company. What Happened?*" The article cited unnamed current and former employees for the contention that Exxon Mobil engineered an increase of 2019 NPV for the Delaware Basin from $40 billion to $50 billion by overestimating how quickly it could drill. That same assertion was the basis for Drs. Gulden and Burch's internal complaints and objections in 2019.

22.     On October 23, 2020, Dr. Gulden was terminated by Exxon Mobil despite performing her job in a competent and professional manner. Exxon Mobil told Dr. Gulden that the reason for her termination was that management had lost confidence in her commitment to the Company and believed that her values were not aligned with those of the Company. Dr. Gulden was terminated in retaliation for her protected activity under SOX.

23.     On December 10, 2020, Dr. Burch was terminated by Exxon Mobil, although Dr. Burch had also been performing his job in a competent and professional manner. Exxon Mobil told Dr. Burch that his termination was based partly on the investigation that commenced in October 2020. Dr. Burch was terminated, however, in retaliation for his protected activity under SOX.

## COUNT I

### (Enforcement of the Order of the Secretary of Labor For Preliminary Reinstatement by Preliminary Injunction)

24.    Plaintiffs hereby incorporate as though restated each of the factual allegations stated in the foregoing paragraphs.

25.    At all times relevant herein, Defendant is a company within the meaning of 18 U.S.C. § 1514A in that it is a company with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l) or a company required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)).

26.    Plaintiffs were employees within the meaning of 18 U.S.C. § 1514A. In the course of their employment, Plaintiffs worked as computational scientists.

27.    Following OSHA's receipt of Plaintiffs' complaint, OSHA investigated it.

28.    On May 6, 2022, the Secretary sent a letter to Defendant, pursuant to 29 C.F.R. § 1980.104(f), advising Defendant that there was reasonable cause to believe that Defendant violated SOX when it terminated both Plaintiffs. The letter further advised that Defendant had failed to provide clear and convincing evidence that it would have taken the same adverse actions in the absence of protected activity. The letter afforded Defendant an opportunity to submit rebuttal evidence.

29.     On July 1, 2022, Defendant responded to the 29 C.F.R. § 1980.104(f) letter asserting that Plaintiffs had failed to establish that they had engaged in activity protected by SOX.

30.     OSHA reviewed Defendant's submissions on the matter and analyzed their various arguments. OSHA found that Defendant's submissions did not demonstrate by clear and convincing evidence that the adverse action would have occurred absent the protected activity since neither Plaintiff had any disciplinary history and both had exemplary work records. The evidence shows that neither Plaintiff was in danger of any disciplinary action until they engaged in protected activity.

31.     On October 6, 2022, the Secretary of Labor issued an Order concluding that there was reasonable cause to believe that Defendant violated SOX in its retaliatory treatment of Plaintiffs.  A true and exact copy of the said Order is attached hereto as Exhibit A.

32.     The Order further provided, pursuant to the authority of the Secretary, that Defendant immediately reinstate both Plaintiffs to their former positions, and that such reinstatement shall include all salary, benefits, rights, and seniority that Plaintiffs would have enjoyed had they never been illegally discharged. Finally, the Order provided that the reinstatement of Plaintiffs will not be stayed by an objection to the Order.

33.     Defendant filed objections to the Order on November 2, 2022.

34.     To date, Defendant has not reinstated the Plaintiffs and recently made clear that it would not do so.

35.     Pursuant to 29 C.F.R. § 1980.105(c), the portion of the Secretary's Order requiring reinstatement became effective immediately upon the Defendant's receipt of the findings and the Order, regardless of any objections to the findings and/or the order.

36.     Because Defendant has failed to comply with the order of preliminary reinstatement, Plaintiffs may file a civil action seeking enforcement of the order in the appropriate United States district court pursuant to 29 C.F.R. § 1980.113. The Plaintiffs, and Secretary, have a strong or substantial likelihood or probability of success on the merits of the claims relating to the Order.

37.     The Secretary's investigation process complied with due process requirements resulted in an Order finding Defendant violated SOX in terminating Plaintiffs.

38.     Plaintiffs have suffered and continue to suffer irreparable harm if they are not immediately reinstated, including that Plaintiffs' productive careers have been damaged and derailed.

39.     Granting the preliminary relief will only require Defendant to comply with the law and will not result in greater harm to Defendant.

40.     Plaintiffs are entitled to reinstatement by Defendant at this time and enforcement by the Court of the Order requiring their reinstatement to their jobs held with Defendant, including with all rights of seniority, status, and benefits of employment.

**WHEREFORE**, for good cause shown, Plaintiffs respectfully request that this Honorable Court grant judgment in their favor as against Defendant and for the following relief:

(A)     An Injunction Order enforcing the Secretary of Labor's preliminary order and SOX's anti-retaliation provisions by permanently enjoining Defendant from failing to reinstate Plaintiffs to their respective positions with the same seniority, status, and benefits of employment they each held prior to their terminations until such time as the administrative and judicial review procedures are exhausted;

(B)     An Order granting Plaintiffs their costs in bringing this action; and

(C)     A grant of such other relief to Plaintiffs as this Court may deem fair and just.

Dated:  December 19, 2022                     Respectfully submitted,

*/s/Neil L. Henrichsen*
Neil L. Henrichsen
NJ Bar ID No. 012931989
HENRICHSEN LAW GROUP, P.L.L.C.
655 15th Street, N.W. Suite 800
Washington, DC 20005 (202) 999-8998
(202) 423-3649
(202) 379-9792 (facsimile)
nhenrichsen@hslawyers.com
*Attorneys for Plaintiffs*

## VERIFICATION OF LINDSEY GULDEN, PH.D.

I, **LINDSEY GULDEN, PH.D.**, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that following is true and correct:

1. I am over the age of eighteen (18) and am competent to testify to the facts stated herein and have personal knowledge of such facts.

2. The facts set forth in my Verified Complaint Seeking Enforcement of An Order of OSHA For Reinstatement are true and correct to the best of my knowledge, information and belief.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed this ___17___ day of December 2022

*Lindsey Gulden* Ph D

LINDSEY GULDEN, PH.D.

## VERIFICATION OF DAMIAN BURCH, PH.D.

I, **DAMIAN BURCH, PH.D.**, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that following is true and correct:

1. I am over the age of eighteen (18) and am competent to testify to the facts stated herein and have personal knowledge of such facts.

2. The facts set forth in my Verified Complaint Seeking Enforcement of An Order of OSHA For Reinstatement are true and correct to the best of my knowledge, information and belief.

**I declare under penalty of perjury that the foregoing is true and correct.**

**Executed this** __16__ **day of December 2022**

*Damian Burch, PhD*
DAMIAN BURCH, PH.D.

13

# EXHIBIT D

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

LINDSEY GULDEN *et al.*,

        Plaintiffs,

        v.

EXXON MOBIL CORPORATION,

        Defendant.

Civil Action No. 22-7418 (MAS) (TJB)

**ORDER**

This matter comes before the Court upon Defendant Exxon Mobil Corporation's ("Defendant") Motion to Dismiss Plaintiffs Dr. Lindsey Gulden and Dr. Damian Burch's ("Plaintiffs") Complaint (ECF No. 1). (ECF No. 20.) Plaintiffs opposed (ECF No. 23), and Defendant replied (ECF No. 24). The Court has carefully considered the parties' papers and decides the motion without oral argument under Local Civil Rule 78.1. Accordingly, for the reasons set forth in the accompanying Memorandum Opinion, and other good cause shown,

**IT IS THEREFORE,** on this 19th day of April 2023, **ORDERED** as follows:

1. Defendant's Motion to Dismiss Plaintiffs' Complaint (ECF No. 20) is **GRANTED.**

2. Plaintiffs' Complaint (ECF No. 1) is **DISMISSED.**

3. Plaintiffs' Motion for Order to Show Cause (ECF No. 2) is **DENIED.**

 

**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| LINDSEY GULDEN *et al.*, | |
| Plaintiffs, | Civil Action No. 22-7418 (MAS) (TJB) |
| v. | **MEMORANDUM OPINION** |
| EXXON MOBIL CORPORATION, | |
| Defendant. | |

**SHIPP, District Judge**

This matter comes before the Court upon Defendant Exxon Mobil Corporation's ("Defendant") Motion to Dismiss Plaintiffs Dr. Lindsey Gulden and Dr. Damian Burch's ("Plaintiffs") Complaint (ECF No. 1). (ECF No. 20.) Plaintiffs opposed (ECF No. 23), and Defendant replied (ECF No. 24). The Court has carefully considered the parties' papers and decides the motion without oral argument under Local Civil Rule 78.1. For the reasons below, the Court grants Defendant's Motion.

## I.    BACKGROUND

Plaintiffs are former employees of Defendant, and this action derives from a whistleblower complaint. (Compl., ECF No. 1.) While employed, Plaintiffs provided Defendant with analysis of its oil projects. (*See id.* ¶¶ 13-14.) In 2019, Defendant's CEO made public statements to investors regarding the company's Delaware Basin project, and Plaintiffs allege that, based on the analyses they provided, these statements overestimated the project's "anticipated future oil and gas production" by billions of dollars. (*See id.* ¶¶ 18, 20-21.) Plaintiffs raised their objections to these statements internally on various occasions. (*Id.* ¶ 20.)

In September 2020, the Wall Street Journal published an article citing "unnamed current and former employees" alleging that Defendant "overestimat[ed] how quickly it could drill" and thereby inflated the Delaware Basin's estimated output by $10 billion. (*Id.* ¶ 21.) The allegations in the article match the allegations made by Plaintiffs in their internal complaints. (*Id.*) Within three months, both Plaintiffs were terminated from their positions. (*See id.* ¶¶ 22-23.)

Following their dismissal, Plaintiffs filed a whistleblower complaint under the Sarbanes-Oxley Act. (*Id.* ¶ 1.) Based on the complaint, the Regional Administrator for the Occupational Safety and Health Administration ("OSHA") completed an investigation at the direction of the Secretary of Labor (the "Secretary"). (*See id.* ¶¶ 27-30.) Following the investigation, the Secretary issued a preliminary order instructing Defendant to (among other things) immediately reinstate Plaintiffs to their former positions. (*Id.* ¶ 32; Prelim. Order, ECF No. 1-1.) Defendant filed a timely objection and chose to ignore the order to reinstate Plaintiffs. (Compl. ¶¶ 33-34.) Now Plaintiffs ask this Court to enforce the preliminary reinstatement order while the underlying dispute proceeds through the agency review process. (*See id.* ¶ 11.)

## II.    **LEGAL STANDARD**

Defendants move to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).[1] A motion to dismiss under Rule 12(b)(1) must be granted if a court lacks subject-matter jurisdiction over a claim. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012). The Court may treat a party's motion as either a facial or factual challenge to the court's jurisdiction. *Dickerson v. Bank of Am., N.A.*, No. 12-3922, 2013 WL 1163483, at *1 (D.N.J. Mar. 19, 2013). Typically, "[a] motion to dismiss . . . for lack of subject[-]matter jurisdiction made prior to the filing of the defendant's answer is a facial challenge

---

[1] Hereafter, all references to "Rule" or "Rules" refer to the Federal Rules of Civil Procedure.

to the complaint." *Bennett v. Atlantic City*, 288 F. Supp. 2d 675, 678 (D.N.J. 2003) (citations omitted). "A facial 12(b)(1) challenge, which attacks the complaint on its face without contesting its alleged facts, is like a 12(b)(6) motion in requiring the court to 'consider the allegations of the complaint as true.'" *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (quoting *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006)). As such, district courts "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

## III.   **DISCUSSION**

The primary issue in this case is whether the Court has jurisdiction to enforce preliminary orders of reinstatement granted under the Sarbanes-Oxley Act ("Sarbanes-Oxley"), 18 U.S.C. § 1514A. This Court finds that it does not have jurisdiction to enforce the Secretary's preliminary order of reinstatement because Sarbanes-Oxley does not grant such power by its plain language or overall construction.

Sarbanes-Oxley enables whistleblowers to file a complaint with the Secretary when they believe they were discharged due to protected activity. 18 U.S.C. § 1514A(b)(1). Sarbanes-Oxley actions are governed by the procedures of another statute: the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR21"). *See id.* § 1514A(b)(2)(A) (incorporating by reference 49 U.S.C. § 42121(b)). AIR21 contemplates two types of orders, preliminary and final. *See* 49 U.S.C. § 42121(b). Paragraph (2) of AIR21 instructs the Secretary to investigate the whistleblower's claims and, if there is reasonable cause to believe a violation

3

occurred, issue a preliminary order granting the relief described in AIR21 subparagraph (3)(B). *See* 49 U.S.C. § 42121(b)(2). Paragraph (3) of AIR21 discusses final orders. *Id.* § 42121(b)(3).

AIR21 uses imprecise language to describe the enforcement process for the Secretary's orders. Rather than state whether district courts can enforce preliminary or final orders, paragraphs (5) and (6) of AIR21 give district courts the power to enforce orders "issued under paragraph (3)." *Id.* §§ 42121(b)(5), (b)(6)(A). Paragraph (3) is titled "Final order" and has three subsections.[2] Because final orders can only be issued under paragraph (3), it is undisputed that AIR21 grants district courts jurisdiction to enforce the Secretary's final orders.

But here Plaintiffs do not have a final order clearly issued under paragraph (3); they have a preliminary order issued under paragraph (2). (*See* Prelim. Order.) They argue that paragraphs (5) and (6) also give district courts jurisdiction over preliminary orders because AIR21 instructs that preliminary orders should contain the relief described in subparagraph (3)(B). (Pls.' Opp'n Br. 3-4, ECF No. 23.) According to Plaintiffs, preliminary orders are issued under paragraph (3) because they provide the types of relief described in subparagraph (3)(B). (*Id.*)

The Court must, thus, determine whether the statute confers jurisdiction upon it for review of only final orders or for both final and preliminary orders. The Second Circuit is the only circuit that has grappled with this issue,[3] finding in a plurality that the Court did not have jurisdiction under these circumstances. *See Bechtel v. Competitive Techs., Inc.*, 448 F.3d 469, 473 (2d Cir. 2006) (citations omitted) ("The plain text of [paragraph (2)] incorporates the types of relief

---

[2] Subsection (A) instructs the Secretary to issue a final order within 120 days; (B) lists remedies the Secretary should order if it "determine[s] that a violation . . . has occurred;" and (C) discusses frivolous complaints. 49 U.S.C. § 42121(b)(3).

[3] Other courts have acknowledged the issue. *See, e.g.*, *Solis v. Tenn. Comm. Bancorp, Inc.*, No. 10-5602, 2010 WL 11187001, at *1 (6th Cir. May 25, 2010) (stating that there is a "substantial question" as to district courts' authority to enforce preliminary orders of the Secretary).

specified in subparagraph [](3)(B); it nowhere suggests that the two [should] be treated identically for federal jurisdictional purposes.").[4] Judge Jacobs wrote the opinion holding that the statute's plain language does not grant jurisdiction. *Id.* at 473. Judge Leval concurred but declined to answer the "very difficult question" of jurisdiction—instead ruling to vacate on due process grounds. *Id.* at 476, 483 (Leval, J., concurring). Judge Straub dissented, concluding that jurisdiction is appropriate because the language and history of Sarbanes-Oxley indicate Congress's intent to allow judicial enforcement of preliminary reinstatement orders. *Id.* at 484-85 (Straub, J., dissenting).

Only a few district courts have considered this question since the *Bechtel* ruling, and a majority of those courts agreed with Judge Jacobs's finding that courts lack jurisdiction. *Compare Welch v. Cardinal Bankshares Corp.*, 454 F. Supp. 2d 552 (W.D. Va. 2006) (providing analysis to support the court's conclusion that it did not have jurisdiction to enforce a preliminary order of reinstatement), *and Solis v. Union Pac. R.R. Co.*, No. 12-394, 2013 WL 440707, at *3 (D. Idaho Jan. 11, 2013) (finding district courts lack jurisdiction to enforce preliminary orders of reinstatement issued pursuant to AIR21), *with Solis v. Tenn. Comm. Bancorp, Inc.*, 713 F. Supp. 2d 701, 714-15 (M.D. Tenn. 2010) (concluding the court had jurisdiction to grant the Secretary's motion for enforcement of a preliminary reinstatement order).

This Court, too, agrees with Judge Jacobs that the provisions of Sarbanes-Oxley and AIR21 do not confer jurisdiction to enforce preliminary orders. The Court's conclusion is supported by a broader reading of AIR21. Subparagraph (4)(A) discusses appellate review and again refers to orders "issued under paragraph (3)." 49 U.S.C. § 42121(b)(4)(A). There is a strong presumption

---

[4] *See also Bechtel*, 448 F.3d at 484 (Straub, J., dissenting) (acknowledging that "an order is not necessarily 'issued under' a provision simply because it provides 'the relief proscribed by' that provision").

that "judicial review will be available only when agency action becomes final." *Bell v. New Jersey*, 461 U.S. 773, 778 (1983); *see also T Mobile NE LLC v. City of Wilmington, Del.*, 913 F.3d 311, 318-19 (3d Cir. 2019). It is therefore inconsistent to read "issued under paragraph (3)" to include non-final orders.[5] Relatedly, paragraphs (5) and (6) allow enforcement of orders in the district "in which the violation was found to occur." 49 U.S.C. §§ 42121 (b)(5), (b)(6)(A). But a violation "has not been 'found to occur' until the Secretary issues a final order; the preliminary order is based only on reasonable cause." *Bechtel*, 448 F.3d at 477 (Leval, J., concurring).

Further, "[i]t seems improbable that Congress would have chosen to confer federal judicial enforcement power" in such an opaque and indirect manner when it could have modified the jurisdictional sections of AIR21 to encompass paragraph (2). *Bechtel*, 448 F.3d at 473. This is especially true because Congress modeled Sarbanes-Oxley and AIR21 on the Surface Transportation Assistance Act of 1978 ("STAA"). *Welch*, 454 F. Supp. 2d at 558. The STAA included explicit language allowing the Secretary to bring an action to enforce its preliminary reinstatement orders in the district courts. *Id.* Here, Congress chose not to include that power.

This Court, however, does recognize Judge Straub's reasoning in the dissent. The language and history of Sarbanes-Oxley show Congress's intent to protect whistleblowers. *Id.* at 486 (Straub, J., dissenting). That is true. But Judge Straub does not point to any "language in the legislative history which addresses in any way the enforceability of a preliminary order of reinstatement." *Id.* at 478 (Leval, J., concurring). And while the statutory text creates an order that is both unstayed during the objection process and unenforceable, "courts do not automatically assume that judicial power is necessary to enforce statutory rights." *Id.* at 473 (plurality opinion)

---

[5] The deadline for filing an appeal under subparagraph (4)(A) is 60 days after "the issuance of the final order of the Secretary." 49 U.S.C. § 42121(b)(4)(A). This again suggests that the orders being discussed are final orders, not preliminary orders.

(citing *Chicago & N.W.R. Co. v. United Transp. Union*, 402 U.S. 570, 578 (1971)). Sarbanes-Oxley sets several deadlines for prompt review and decision-making.[6] This Court agrees with Judge Jacobs that the expeditious nature of the review process counsels against judicial enforcement of preliminary reinstatement orders absent permissive statutory language. *See Bechtel*, 448 F.3d at 474 (plurality opinion).[7]

## IV.    CONCLUSION

Given the plain text of Sarbanes-Oxley and AIR21, this Court grants Defendant's Motion to Dismiss.[8] The Court will enter an Order consistent with this Memorandum Opinion.

_____
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

---

[6] *See, e.g.*, 18 U.S.C. § 1514A(b)(1)(B) (providing for de novo review in the district courts if the Secretary fails to issue a final decision within 180 days of the complaint filing).

[7] The Court also acknowledges that 29 C.F.R. § 1980.113 (2015) indicates that the Secretary believes federal courts should enforce these preliminary reinstatement orders. But even Judge Straub recognized that the agency rule is "by no means authoritative" and should receive at most "some minimal deference." *Bechtel*, 448 F.3d at 486-87 (Straub, J., dissenting).

[8] Because this Court lacks jurisdiction, it declines to address the merits of Plaintiff's Order to Show Cause for Preliminary Injunction Seeking Enforcement of an Order of the Secretary of Labor for Reinstatement. (ECF No. 2.)

# EXHIBIT E

**UNITED STATES DEPARTMENT OF LABOR**

**OFFICE OF ADMINISTRATIVE LAW JUDGES**

**COVINGTON DISTRICT OFFICE**

*Issue Date: 28 August 2023*

*In the Matter(s) of*:

| | |
|---|---|
| **LINDSEY GULDEN** and **DAMIAN BURCH,** *Complainants*, | **OALJ NO(S).:  2023-SOX-00021** **2023-SOX-00022** |
| v. | **OSHA NO(S).:  6-1730-21-120** |
| **EXXON MOBIL CORPORATION,** *Respondent.* | **PATRICK M. ROSENOW** District Chief Administrative Law Judge |

## RULING ON COMPLAINANTS' MOTION TO ENFORCE REINSTATEMENT

These proceedings arise under the Sarbanes-Oxley Act of 2002, otherwise known as the Corporate and Criminal Fraud Accountability Act[1], (herein "SOX" or "the Act"), and its implementing regulations[2], which are employee protective provisions. The Secretary of Labor is empowered to investigate and determine "whistleblower" complaints filed by employees of publicly traded companies who are allegedly discharged or otherwise discriminated against regarding the terms and conditions of their employment for providing information about fraud against company shareholders to supervisors, federal agencies, or members of Congress.

On 10 Feb 21, Complainants filed their initial complaint with the Occupational Safety and Health Administration (OSHA), alleging they had been unlawfully terminated by Respondent in violation of the Act. OSHA completed its investigation and on 6 Oct 22 issued a decision ordering Respondent, *inter alia*, to reinstate Complainants. After Respondent filed objections and a request for a de novo hearing on 2 Nov 22, the complaint was referred to the Office of Administrative Law Judges (OALJ), but not actually docketed or assigned to this office until May/June of 2023.

---

[1] 18 U.S.C. § 1514A.
[2] 29 C.F.R. Part 1980.

5100 Village Walk, Suite 200, Covington, Louisiana 70433
Telephone 985.809.5173 – email OALJ-Covington@dol.gov
https://www.dol.gov/agencies/oalj/contacts/COVINGTON

In the meantime, Complainants filed an action in the United States District Court of New Jersey, seeking an order to enforce compliance with the OSHA reinstatement order. On 19 Apr 23 the District Court granted Respondent's Motion to Dismiss.[3] Complainants appealed that decision to the Third Circuit, where it is currently pending.

After an initial conference call on 20 Jun 23, I issued a scheduling order with a hearing set for 12 Mar 24. Complainants then filed a motion to enforce the OSHA Order to Reinstate. Respondent filed its opposition shortly thereafter.

The applicable legal standards have been thoroughly cited by the parties and I find no reason to repeat their work in that regard. The sole issue is whether OSHA's reinstatement order is enforceable while Respondent's objection and a de novo review is pending before OALJ. There is a difference of opinion in the courts on the answer to that question. It appears the position of the Agency is that the order is enforceable since it has joined Complainants on appeal.

However, what is clear is that the Agency has no independent executable enforcement authority. Complainants' filing in the district court implicitly recognizes as much. Moreover, OALJ's role is to conduct a *de novo* review and ALJs cannot even consider the substantive aspects of an OSHA decision, much less enforce them. Within the context of the obligation to follow statute, regulation, and board precedent, whether OSHA's order is enforceable is a question properly before the Article 3 courts. I decline Complainants' invitation to usurp that authority. Therefore, Complainants' motion is DENIED.

   **ORDERED** this 28th day of August, 2023, at Covington, Louisiana.




                              **PATRICK M. ROSENOW**
                              District Chief Administrative Law Judge




---
[3] Case 3:22-cv-07418-MAS-TJB.

# EXHIBIT F

**U.S. Department of Labor**    Administrative Review Board
200 Constitution Ave. NW
Washington, DC 20210-0001



IN THE MATTER OF:


LINDSEY GULDEN,                          ARB CASE NO. 2023-0050

    and                              ALJ CASE NO. 2023-SOX-00021
                                2023-SOX-00022
DAMIAN BURCH,                            ALJ PATRICK M. ROSENOW

      COMPLAINANTS,              DATE: February 29, 2024

    v.

EXXON MOBIL CORPORATION,

      RESPONDENT.


**Appearances:**

***For the Complainant:***
    Neil L. Henrichsen, Esq., and Ronald P. Angerer, II, Esq.; *Henrichsen Law Group, P.L.L.C.*; Washington, District of Columbia

***For the Respondent:***
    Richard J. Cino, Esq., and Bianca M. Olivadoti, Esq.; *Jackson Lewis, P.C.*; Berkeley Heights, New Jersey

**Before HARTHILL, Chief Administrative Appeals Judge, and WARREN and ROLFE, Administrative Appeals Judges**


### DECISION AND ORDER DENYING INTERLOCUTORY APPEAL

HARTHILL, Administrative Appeals Judge:

    This case arises under the employee protection provisions of Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the

Sarbanes-Oxley Act (SOX), as amended, and its implementing regulations.[1] On September 11, 2023, Lindsey Gulden (Gulden) and Damian Burch (Burch) (collectively, Complainants) filed a petition for interlocutory review requesting that the Administrative Review Board (Board) review an Administrative Law Judge's (ALJ) order denying Complainants' motion to enforce a preliminary reinstatement order. For the following reasons, we deny Complainants' petition for interlocutory review.

## BACKGROUND

Complainants are former scientists for Exxon Mobil Corporation (Respondent).[2] On February 10, 2021, Complainants filed a joint whistleblower complaint with the Occupational Safety and Health Administration (OSHA), alleging that Respondent retaliated against them in violation of the SOX by terminating their employment.[3]

On October 6, 2022, OSHA found reasonable cause to believe that Respondent violated the SOX. OSHA ordered Respondent to "immediately reinstate both Complainants to their former position. Such reinstatement shall include all salary, benefits, rights and seniority that Complainants would have enjoyed had they never been illegally discharged. Such reinstatement is not stayed by an objection to this order."[4] This language is consistent with the SOX's implementing regulations, which provide, "[i]f a timely objection is filed, all provisions of the preliminary order will be stayed, except for the portion requiring preliminary reinstatement, which will not be automatically stayed."[5]

On November 2, 2022, Respondent requested a hearing before an ALJ with the Office of Administrative Law Judges (OALJ).[6] Respondent has neither reinstated Complainants nor filed a motion to stay the order of reinstatement.

---

[1]     18 U.S.C. § 1514A; 29 C.F.R. Part 1980 (2023).

[2]     Complainants' Response to Order to Show Cause at 2.

[3]     Ruling on Complainants' Motion to Enforce Reinstatement (Ruling) at 1.

[4]     *Id.*; Complainants' Response to Order to Show Cause, EX B OSHA's Preliminary Order at 8.

[5]     29 C.F.R. § 1980.106(b).

[6]     Ruling at 1.

On December 20, 2022, Complainants filed a complaint and emergency motion to show cause in the United States District Court of New Jersey, seeking an order to enforce Respondent's compliance with OSHA's preliminary reinstatement order.[7] Respondent filed a motion to dismiss.[8] On April 19, 2023, the District Court granted Respondent's motion to dismiss, finding that the court did not have subject matter jurisdiction because the order of reinstatement was not a final order of the Department of Labor.[9] Complainants appealed the dismissal to the Third Circuit.[10] The Solicitor of Labor filed an amicus brief in support of Complainants.[11] As of the date of this order, that appeal is still pending, and oral argument is scheduled for March 6, 2024.[12]

After the District Court granted Respondent's motion to dismiss, Complainants filed a motion to enforce OSHA's reinstatement order with OALJ.[13] On August 28, 2023, the ALJ issued a Ruling on Complainants' Motion to Enforce Reinstatement (Ruling), finding that "the Agency has no independent executable enforcement authority."[14] The ALJ stated that "OALJ's role is to conduct a *de novo* review and ALJs cannot even consider the substantive aspects of an OSHA decision, much less enforce them."[15] The ALJ concluded that, "whether OSHA's order is enforceable is a question properly before the Article 3 courts," and denied Complainants' motion.[16]

On September 11, 2023, Complainants filed a Petition for Review with the Board, seeking review of the Ruling. On September 29, 2023, the Board issued an

---

[7]      *Id.* at 2.

[8]      *Id.* (citing *Gulden v. Exxon Mobil Corp.*, Case No. 3:22-cv-7418-MAS-TJB, 2023 WL 3004854 (D.N.J. Apr. 2023) (Respondent argued that the District Court of New Jersey lacked subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1))).

[9]      Ruling at 2; *Gulden*, 2023 WL 3004854, at *3.

[10]     Ruling at 2.

[11]     Acting Secretary of Labor's Brief as Amicus Curiae in Support of Plaintiffs-Appellants and Reversal of the District Court's Decision at 1.

[12]     Notification Letter for Oral Argument on March 6, 2024, No. 23-1859 (3d Cir. Feb. 14, 2024).

[13]     Ruling at 2.

[14]     *Id.*

[15]     *Id.*

[16]     *Id.*

Order to Show Cause, finding that Complainants' Petition constituted an interlocutory appeal because the ALJ had not yet issued a final decision fully disposing of the Complainants' complaint.[17] The Board ordered Complainants to show cause no later than October 13, 2023, as to why the Board should not dismiss this interlocutory appeal.[18] Complainants and Respondent filed timely responses to the Board's Order to Show Cause.

JURISDICTION AND STANDARD OF REVIEW

The Board's delegated authority includes the consideration and disposition of interlocutory appeals "in exceptional circumstances, provided such review is not prohibited by statute."[19] Interlocutory appeals are generally disfavored given the strong policy against piecemeal appeals.[20] When a party seeks interlocutory review of an ALJ's non-final order, the Board has elected to look to the interlocutory review procedures used by federal courts, including providing for review under the collateral order doctrine.[21]

DISCUSSION

## 1. Complainants' Interlocutory Appeal Is Timely

Citing 28 U.S.C. § 1292(b), Respondent contends interlocutory appeals must be filed within ten days after entry of the order being appealed.[22] Because Complainants filed their interlocutory appeal fourteen days after the ALJ issued the Ruling, Respondent contends Complainants' interlocutory appeal is untimely.[23] However, that ten-day deadline only applies in instances where the interlocutory

---

[17]    Order to Show Cause at 3.

[18]    *Id.* at 4.

[19]    Secretary's Order No. 01-2020 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board), 85 Fed. Reg. 13186 (Mar. 6, 2020)).

[20]    *Gunther v. Deltek, Inc.*, ARB Nos. 2012-0097, -0099, ALJ No. 2010-SOX-00049, slip op. at 2 (ARB Sept. 11, 2012) (citing *Carter v. B & W Nuclear Techs., Inc.*, ALJ No. 1994-ERA-00013 (Sec'y Sept. 28, 1994)) (citations omitted).

[21]    *Powers v. Pinnacle Airlines, Inc.*, ARB No. 2005-0138, ALJ No. 2005-SOX-00065, slip op. at 5-6 (ARB Oct. 31, 2005).

[22]    Respondent's Response to Order to Show Cause at 8.

[23]    *Id.* (citing 28 U.S.C. § 1292(b)).

appeal has been certified by the trial court. Here, instead, Complainants seek review under the collateral order doctrine.[24] In *Priddle v. United Airlines, Inc.*, the Board held that "collateral orders will be treated as final orders for appeal purposes" and, consequently, the deadline for appeals of ordinary final orders under the applicable statute will be applied to collateral order appeals.[25]

The SOX regulations state that a party seeking review of an ALJ's decision must file a petition for review with the Board "within 14 days of the date of the decision of the ALJ."[26] The ALJ issued the Ruling on August 28, 2023,[27] and Complainants filed their appeal with the Board on September 11, 2023, fourteen days later. Thus, Complainants filed a timely collateral order appeal.

## 2. The Board Declines to Exercise Its Discretion to Accept Complainants' Petition for Interlocutory Review

The Board may consider reviewing an interlocutory order that meets the "collateral order" exception, which applies if the appealed decision belongs to that "small class [of decisions] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the *whole* case is adjudicated."[28] To fall within the narrow "collateral order" exception to the traditional finality rule, the moving party must establish that the order being appealed: (1) conclusively determines the disputed question; (2) resolves an important issue completely separate from the merits of the action; and (3) would be effectively unreviewable on appeal from a final judgment.[29] This exception is "strictly construe[d]" to avoid "unnecessarily protracte[d] litigation."[30]

---

[24]     28 U.S.C. § 1292(b). Complainants did not ask the ALJ to certify this issue for appellate review.

[25]     *Priddle v. United Airlines, Inc.*, ARB No. 2021-0064, ALJ No. 2020-AIR-00013, slip op. at 6 (ARB Jan. 26, 2022).

[26]     29 C.F.R. § 1980.110(a).

[27]     Ruling at 1.

[28]     *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).

[29]     *Adm'r, Wage & Hour Div., U.S. Dep't of Lab. v. Goldstar Amusements, Inc.*, ARB No. 2022-0027, ALJ Nos. 2021-TNE-00027, -00028, slip op. at 5 (ARB Sept. 30, 2022).

[30]     *Id.* (quoting *Johnson v. Siemens Building Tech., Inc.*, ARB No. 2007-0010, ALJ No. 2005-SOX-00015, slip op. at 5 (ARB Jan. 19, 2007)).

If the ALJ's Order "fails to satisfy any one of these requirements, it is not appealable under the collateral order doctrine."[31] And even if the order meets the requirements, the Board's decision to accept the petition remains discretionary.[32]

As a matter of discretion, we find not accepting the petition for interlocutory review at this time does not make the ALJ's order effectively unreviewable. Complainants' appeal of the District Court's order is currently pending before the Third Circuit. Both Complainants and the Acting Secretary of Labor have asked the Circuit Court to reverse the District Court's order and find the SOX authorizes judicial enforcement of post-investigation preliminary orders as well as final orders.[33] Given the Secretary's long-held position,[34] we find the most efficient way to direct the course of the litigation below in its current posture is to remand this matter to the OALJ to continue the remaining agency proceedings on the complaint while affording the Third Circuit the opportunity to rule on judicial enforcement of the preliminary order.

---

[31]     *Id.* (quoting *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 276 (1988); *Kossen v. Empire Airlines*, ARB No. 2021-0017, ALJ No. 2019-AIR-00022, slip op. at 2 (ARB Feb. 25, 2021)).

[32]     Secretary's Order No. 01-2020, ¶ 5; *Priddle v. United Airlines*, ARB No. 2022-0006, ALJ No. 2020-AIR-00013, slip op. at 4 (ARB Mar. 21, 2022).

[33]     Brief of Appellant at 20; Acting Secretary of Labor's Brief as Amicus Curiae in Support of Plaintiffs-Appellants and Reversal of the District Court's Decision at 29-30.

[34]     *Id.* at 5-6 (citing Procedures for the Handling of Discrimination Under Section 519 of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, Interim final rule, 67 Fed. Reg. 15454, 15461 (Apr. 1, 2002); Procedures for the Handling of Discrimination Complaints Under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act, Final rule, 69 Fed. Reg. 52104, 52111 (Aug. 24, 2004) (Sarbanes-Oxley); Procedures for the Handling of Retaliation Complaints Under Section 806 of the Sarbanes-Oxley Act of 2002, as Amended, 80 Fed. Reg. 11865, 11874 (Mar. 5, 2015)).

### 3. Practical Effects Test Does Not Apply

Complainants assert the Board may also review this matter pursuant to the practical effects test.[35] The practical effects test allows for immediate appeal of orders that (1) have the practical effect of an injunction, and (2) can be "effectively challenged only by immediate appeal" because the interlocutory order "might have a serious, perhaps irreparable, consequence."[36] Complainants contend the enforcement of a preliminary order is plainly injunctive in nature and that a lack of enforcement "will allow evasion of future review because the issue will become moot if not immediately reviewed."[37] Complainants conclude that "the practical effect of the lack of review is no review."[38]

As set forth in Section 2, Complainants' appeal of the District Court's order is currently pending before the Third Circuit and Complainants have opined that a merits decision by the ALJ does not moot the appeal "because the issue is capable of repetition, yet evading review."[39] Thus, we find the practical effects test does not apply.[40]

---

[35]    Complainants' Response to Order to Show Cause at 9.

[36]    *Petitt v. Delta Airlines, Inc.*, ARB No. 2022-0047, ALJ No. 2018-AIR-00041, slip op. at 5 (ARB Sept. 26, 2022) (citation omitted).

[37]    Complainants' Response to Order to Show Cause at 10-11.

[38]    *Id.* at 11.

[39]    Complainants' Letter Brief to Third Circuit at 2 (Feb. 14, 2024).

[40]    Respondent contends Complainants should be equitably estopped from simultaneously litigating the same issue in two different venues. Respondent's Response to Order to Show Cause at 9. Because we decline to accept interlocutory review of the ALJ's Ruling on Complainants' Motion to Enforce Reinstatement under either the collateral order exception or the practical effects test, this issue is moot.

8

### CONCLUSION

Accordingly, we **DENY** Complainants' Petition for Interlocutory Review and remand to the OALJ to continue the remaining agency proceedings.

**SO ORDERED.**

**SUSAN HARTHILL**
**Chief Administrative Appeals Judge**

**IVEY S. WARREN**
**Administrative Appeals Judge**

**JONATHAN ROLFE**
**Administrative Appeals Judge**

# EXHIBIT G

**UNITED STATES DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**
**COVINGTON DISTRICT OFFICE**

*In the Matter(s) of:*

| | |
|---|---|
| **LINDSEY GULDEN AND** | OALJ NO(S): 2023-SOX-00021 |
| **DAMIAN BURCH,** | 2023-SOX-00022 |
| *Complainants,* | |
| | OSHA NO(S): 6-1730-21-120 |
| **v.** | |
| **EXXON MOBIL CORPORATION,** | **PATRICK M. ROSENOW** |
| | District Chief Administrative Law Judge |
| *Respondent.* | |

---

**COMPLAINANTS' BILL OF PARTICULARS**

**COME NOW** Complainants Lindsey Gulden ("Gulden") and Damian Burch ("Burch") (collectively referred to as "Complainants"), by and through their undersigned counsel and pursuant to the Administrative Law Judge's June 19, 2023 Notice of Hearing and Pre-Hearing Order, and hereby allege claims pursuant to Section 806 of the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A(a)(1)-(2), against Respondent, Exxon Mobil Corporation ("ExxonMobil" or the "Company" or "Respondent"), and state as follows:

**PARTIES AND JURISDICTION**

1.      Complainant Gulden, who is an adult female, is a resident of the State of Massachusetts, and was regularly employed by ExxonMobil at all times relevant herein within the City of Spring, Texas.  Complainant Gulden holds a Ph.D. in Geoscience from the University of Texas, Austin.

2.      Complainant Burch, who is an adult male, is a resident of the State of Texas, City of Spring, and was regularly employed by ExxonMobil at all times relevant herein within the City

of Spring, Texas. Complainant Burch holds a Ph.D. in Physical Applied Mathematics from the Massachusetts Institute of Technology.

3.    Respondent ExxonMobil is a New Jersey corporation with headquarters in Irving, Texas. ExxonMobil is a company with a class of securities registered under 15 U.S.C. § 78l and/or that is required to file reports under 15 U.S.C. § 78o(d).

4.    Complainants Gulden and Burch were unlawfully terminated in retaliation for actual and suspected protected whistle-blower activities as described herein in violation of SOX.

## FACTUAL ALLEGATIONS AND CLAIM

5.    ExxonMobil is an American multinational oil and gas corporation and is a publicly traded company.

6.    ExxonMobil holds a significant stake in the Delaware Basin, a geologic depositional and structural basin in West Texas and southern New Mexico known for holding large oil fields.

7.    During the relevant time period, Ms. Gulden was employed by ExxonMobil in the position of Team Lead of the Global Business Lines Analytics and Optimization team within the Data Science and Optimization Section in the Digital Transformation group of Upstream Integrated Solutions. Ms. Gulden's responsibilities in that position included: (a) making analytic technical contributions when necessary; (b) building, managing, and executing a portfolio of projects in which analytics and optimization capability could assist decision makers in Upstream Oil and Gas; and (c) mentoring junior staff on her team in project scope and execution, stakeholder engagement, and other initiatives.

8.    During the relevant time period, Mr. Burch was employed by ExxonMobil in the

2

position of Development Planner in the Unconventional Development Planning group (the "Delaware Planning Team") in the Upstream Development Planning division of ExxonMobil Global Projects. Mr. Burch's responsibilities in that position included: (a) simulating the long-term development of the Delaware Basin, as well as other ExxonMobil properties; (b) performing economic analyses of different development strategies for the Delaware Basin, as well as other ExxonMobil properties; and (c) developing new strategies that could improve the economics of a property.

9.      In 2018, ExxonMobil estimated that the net present value ("NPV") of its Delaware Basin holdings to be $60 Billion. The NPV estimate is a metric that describes the value of a particular development plan under certain economic assumptions. The core component of a development plan is the schedule of wells to be drilled and completed. The schedule is built using projected numbers of drilling rigs and fracking crews and best-guess assumptions for drilling speed and completion speed. NPV is calculated by discounting cash flow that is estimated by combining the development plan schedule, best guesses for oil and gas coming out of planned wells, cost calculations for development activities, and assumed commodity prices.

10.     While the level of activity of ExxonMobil's drilling in the Delaware Basin increased in 2018 and 2019, the actual, real-world drilling speeds were still considerably slower than the 2018 estimates.

11.     During the 2019 planning and budget season, the Delaware Development Planning Team revised the development plan for the Delaware Basin holdings using refined time-to-drill estimates generated by company drilling experts and based on actual drilling speeds that had been measured over the prior year. Due largely to the slower-than-anticipated drilling times, the NPV estimate for the initial 2019 development plan was $40 Billion, $20 Billion less than the NPV

3

estimate for the 2018 development plan.

12.    In April 2019, Respondent filed an SEC Form 8-k wherein it stated:

ExxonMobil has revised its Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as early as 2024.  The size of the company's resource base in the Permian is approximately 10 billion oil-equivalent barrels and is likely to grow further as analysis and development activities continue.

13.    The said April 2019 SEC filing by Respondent conformed with then-recent public statements made to the investor community by ExxonMobil's CEO, wherein ExxonMobil pledged that it would increase oil and gas production in the Permian Basin, which includes the Delaware Basin, to one million barrels per day by 2024.

14.    However, the above-referenced representations and statements were based on the Respondent's 2018 development plan, and the revised drilling speeds that factored into the $40 Billion-NPV original 2019 development plan were well below the level needed to support ExxonMobil's representations and statements to the public and SEC.

15.    To ensure conformity with these representations, ExxonMobil placed significant pressure on the Delaware Development Planning Team to change the development plan so that the 2019 NPV estimate would increase and so that production projections would be consistent with ExxonMobil's representations and statements.

16.    After sharing the initial 2019 $40-Billion-NPV development plan with upper management, ExxonMobil's Delaware Basin Development Manager, Melissa Bond ("Bond"), instructed the Delaware Planning Team to generate higher 2019 NPV estimates by revising the assumptions used to build the development plan in a way that would "claw back" value.

17.    When the use of revised, but still plausibly realistic, assumptions failed to significantly increase the Delaware Basin's NPV estimate and accelerate production projections,

Bond decided to mandate the use of increasingly aggressive "drilling learning curve" assumptions. The "drilling learning curve" assumptions refers to the assumption that drilling speeds will increase the longer a drilling crew stayed in a certain area.

18.    Bond dictated increasingly unrealistic learning curve assumptions until the NPV of the resulting Delaware development plan reached an estimated value of $50 Billion. However, by that point, the learning curve assumptions were fully inconsistent with ExxonMobil's actual drilling speed data and with the learning assumptions from ExxonMobil's drilling experts. Accordingly, such information was false.

19.    Several members of the Delaware Planning Team, including Mr. Burch, objected to the $50 Billion NPV estimate, because it was based on learning curve assumptions that were not supported by actual historical drilling speed data. Further, the learning curve assumptions were created post hoc by non-expert management, against the advice of the experts, and for the sole purpose of inflating the NPV estimate and production projections.  Mr. Burch initially refused to use the learning curve assumption that generated that estimate because it was purposefully misleading. However, Bond insisted that it be used in the official estimate.

20.    As a data analytics professional, Ms. Gulden conducted her own study of whether the learning curve theory was supported by actual data. To perform the study, Ms. Gulden analyzed publicly available drilling-time data for more than 10,000 wells in the Delaware Basin, and observed that, while drilling times had fallen between the late 2000s and early 2010s, drilling times over the past several years remained essentially unchanged.

21.    In other words, there was no objective, verifiable support for ExxonMobil's production estimates regarding the Delaware Basin wells and the underlying learning curve being utilized.

5

22.     Ms. Gulden forwarded the results of her study to Mr. Burch and the supervisor of the Delaware Development Planning team, Ozgur Ozen, in support of Mr. Burch's objections to Bond's chosen learning-curve assumption.

23.     On October 23, 2019, Bond held a Delaware Basin-wide meeting in which Mr. Burch was asked to present the Delaware Basin drilling plan based on the learning curve assumptions mandated by Bond. Among those present at this meeting were the individuals who would be conducting the actual drilling.

24.     During the presentation, when Mr. Burch described the drilling speed and drilling learning curve assumptions that were used to generate the plan, one of the drillers listening to the presentation interrupted the presentation and stated, "That is impossible." Before Mr. Burch could respond, Bond told the audience that Mr. Burch must have made a mistake and that Mr. Burch, a mathematical modeling expert, did not understand mathematical modeling.

25.     Nevertheless, Bond did not seek any modification to the model.

26.     The true and correct forecast of oil production and cost of supply for ExxonMobil's Delaware Basin holdings was not used by the Company in public filings, which constitutes a violation of criminal fraud statutes, SEC rules and/or regulations, and Federal law relating to fraud against shareholders.

27.     Appalled that Bond was knowingly using false data to exaggerate drilling output, while blaming the person – Burch – who initially objected to the exaggerated assumption when other employees made similar objections, Ms. Gulden submitted an internal complaint on October 23, 2019 with Tanya Miller, a representative in ExxonMobil's Human Resources Department.

28.     Shortly after Ms. Gulden's October 23, 2019 verbal complaint, Mr. Burch spoke with Ms. Miller and raised similar complaints regarding Bond's insistence on using false data to

exaggerate drilling output. On November 14, 2019, at Ms. Miller's suggestion, Mr. Burch forwarded emails corroborating his assertions to Scott Clingman, Ms. Miller's supervisor in the Human Resources Department.

29.    Complainants, by and through their respective complaints and objections, engaged in protected activity under SOX.

30.    Mr. Burch also wrote to ExxonMobil's human resources department on November 14, 2019, stating, in pertinent part, that:

> our organization was misleading senior management this summer. Basically, they asked us to turn any knobs we could in our modeling software to get the forecasts NPV up, and (a) they didn't care whether or not those new assumptions were realistic (they weren't) and (b) they didn't make any changes that would be required to try to operationalize these new assumptions.  The biggest offender was the "learning curve", which is an assumption that we'll more than double our drilling speed in the next five years.

31.    Ms. Gulden and Mr. Burch's complaints triggered an internal investigation that reached upper management. Upon information and belief, the investigation activities took place throughout 2020. However, neither Ms. Gulden nor Mr. Burch were informed of any conclusions rendered or actions taken by ExxonMobil in response to the investigation.

32.    On August 27, 2020, the Wall Street Journal ("WSJ") contacted ExxonMobil's Public & Government Affairs Department.  The WSJ was reaching out concerning an article it intended to publish regarding ExxonMobil's development activities, expectations, and plans in the Delaware Basin.

33.    On September 13, 2020, an article was published in the Wall Street Journal entitled, "*Exxon Used to Be America's Most Valuable Company. What Happened?*" The article cited unnamed current and former employees for the contention that ExxonMobil engineered an increase of 2019 NPV for the Delaware Basin from $40 Billion to $50 Billion by overestimating how

quickly it could drill. That same assertion was the basis for Ms. Gulden and Mr. Burch's internal complaints in October and November 2019.

34.    ExxonMobil initiated an investigation believing that both Ms. Gulden and Mr. Burch were sources of the said WSJ article and inquiry.

35.    In October 2020, Rick McGovern, an investigator in ExxonMobil's Audit Department, notified Mr. Burch that he was under investigation for sending e-mails from his ExxonMobil email account to his personal email account in July, 2020. ExxonMobil's alleged reason for the investigation was unrelated to the subject of Mr. Burch's internal complaint and the Wall Street Journal article.

36.    During the initial investigative meeting, Mr. Burch explained to Mr. McGovern that the emails he sent to his personal e-mail account did not contain any proprietary or other company information. At the end of the initial investigative meeting, Mr. McGovern told Mr. Burch that "the case is closed."

37.    Despite telling Mr. Burch that "the case is closed," the investigation into Mr. Burch was not closed. Mr. McGovern subsequently requested additional data from Mr. Burch's computer and conducted a follow-up meeting with Mr. Burch. Mr. McGovern also told Mr. Burch that he (Mr. Burch) was prohibited from discussing the investigation with anyone else at or outside of ExxonMobil. That instruction violated ExxonMobil's written personnel policies, which sets forth a formal procedure for employees to discuss any employment-related concerns with ExxonMobil management and Human Resources.

38.    Shortly after the initial investigative meeting with Mr. McGovern, Mr. Burch received a notification that his LinkedIn account had been viewed by Beth Casteel, the global head of the Audit Department. The global head of the Audit Department is several levels above Mr.

8

McGovern within Respondent's organizational management.

39.     McGovern's position and would normally be involved only in investigations of matters far more significant than the issue Mr. McGovern claimed was the basis for his investigation of Mr. Burch. Further, at approximately the same time, Ms. Gulden received a similar notification that Ms. Casteel had viewed her LinkedIn account as well, which indicated that Mr. Burch and Ms. Gulden were being scrutinized by the Company for a common reason.

40.     On October 23, 2020, just over one month after the publication of the Wall Street Journal article, Ms. Gulden was terminated by ExxonMobil despite performing her job in a competent and professional manner. ExxonMobil told Ms. Gulden that the reason for her termination was that management had lost confidence in her commitment to the Company and believed that her values were not aligned with those of the Company. Ms. Gulden was terminated in retaliation for her protected activity under SOX, including because ExxonMobil believed Ms. Gulden was a source of the WSJ article information referenced herein.

41.     On December 10, 2020, Mr. Burch was terminated by ExxonMobil, although Mr. Burch had also been performing his job in a competent and professional manner. ExxonMobil told Mr. Burch that his termination was based partly on the investigation that commenced in October 2020. Specifically, ExxonMobil stated that Mr. Burch was determined to have forwarded company files to his personal email address, and that he had modified as well as failed to disclose certain company documents during the investigation. Those allegations are false, as ExxonMobil further admitted that they could not determine the nature of the files Mr. Burch allegedly forwarded to his email address. Mr. Burch did not forward any company files to his personal email address, did not modify any company documents except in the normal course of business, and did not withhold any company documents from the company in the course of its investigation. Accordingly, the

9

alleged reasons for Mr. Burch's termination by ExxonMobil were pretextual.

42.    ExxonMobil also told Mr. Burch that it was terminating him because he had cancelled one meeting with the investigators. However, Mr. Burch cancelled that meeting specifically to report retaliation to ExxonMobil's Human Resources department.  Such reporting is required by ExxonMobil's standards of business conduct in response to any retaliatory event. Mr. Burch also sent the investigator an e-mail saying that he would continue to cooperate with the investigators after discussing the matter with Human Resources.

43.    ExxonMobil's third stated reason for terminating Mr. Burch was because he allegedly did not cooperate with the investigation.  However, Mr. Burch fully complied with the investigation, providing the investigators with every piece of information they asked for, and voluntarily providing them with a company laptop of which the investigators were not aware.  In his last meeting with the investigators, Mr. Burch was asked for more information from his company computer.  Mr. Burch told the investigator that it would be easy to collect all of the newly requested information together, which he said he would do that weekend.  However, at the end of the meeting, Mr. Burch was suspended and his laptops were taken from him, making it impossible to continue to cooperate with the investigation.

44.    Finally, ExxonMobil told Mr. Burch that it was terminating him because "it's become clear that you have some very negative sentiments from the company strategy." However, the only company strategy about which Mr. Burch expressed negative sentiments was the decision to artificially inflate the value of the Delaware Basin by using impossible drilling speed assumptions.

45.    Mr. Burch was terminated in retaliation for his protected activity under SOX including  because ExxonMobil believed Mr. Burch was a source of the WSJ article information

referenced herein.

46.     Complainants are entitled to the protections of SOX.  Complainants' reporting of problems within ExxonMobil as set forth herein involved the financial reporting of a publicly traded company.

47.     Complainants filed a complaint with the Secretary of Labor through the Occupation Safety and Health Administration ("OSHA") on February 10, 2021.

48.     ExxonMobil received notice of Complainants' OSHA complaint through their Managing Counsel, Labor & Employment.

49.     During the investigative process, ExxonMobil was afforded due process and ample opportunity to address the claims arising from Complainants' OSHA complaint, as evidenced by the multiple responses submitted to OSHA by ExxonMobil.

50.     On May 6, 2022, OSHA released its preliminary finding to ExxonMobil that it had reasonable cause to believe ExxonMobil had violated Complainants' rights under SOX. ExxonMobil was afforded an opportunity to respond to the factual allegations contained therein.

51.     The May 6, 2022 preliminary finding provided the following:

> Complainants engaged in protected activity several times in 2019 when they addressed with Respondent's management their concerns with the assumptions leading to the estimated NPV of the Permian Basin and how these assumptions may have led to misleading statements in SEC filings.  Respondent was aware of the Complainant's protected activity and the evidence suggests such protected activity may have been a contributing factor in their terminations.  However, Respondent claims that both Complainants were fired due to their suspected leak of company information to the Wall Street Journal.

> OSHA finds that if Complainants did provide information to the Wall Street Journal, it constitutes protected activity because the communication with the WSJ likely related to alleged violations of section 1341, 1343, 1344, 1348 or to any rule or regulation of the SEC or any Federal law relating to fraud against shareholders.

Further if Complainants <u>did not</u> provide information to the Wall Street Journal, they were still illegally fired because Respondent believed that Complainants were the WSJ's source and Respondent cannot lawfully terminate Complainant's employment because it suspected Complainants engaged in protected activity.

52.    Based on the above, among other things, OSHA advised ExxonMobil that it had "determined there is reasonable cause to believe that Exxon . . . has violated the Sarbanes-Oxley Act (SOX), <u>18 U.S.C §1514A</u> . . . ." (emphasis added).

53.    ExxonMobil responded on July 1, 2022 to the May 6, 2022 preliminary finding. ExxonMobil was, therefore, afforded a fair and reasonable opportunity to address OSHA's preliminary factual findings, as well as its ultimate finding.

54.    On October 6, 2022, OSHA released its final determination and preliminary order concerning Complainants SOX claims.  OSHA concluded that ExxonMobil had violated SOX and ordered that certain relief be afforded to Complainants.

55.    Furthermore, the October 6, 2022 final determination required, inter alia, immediate reinstatement of the Complaints by ExxonMobil to their prior positions.

56.    In particular, the October 6, 2022 final determination stated as follows:

Upon receipt of this Secretary's Finding and Preliminary Order, Respondent shall immediately reinstatement both Complainants to their former positions.  Such reinstatement shall include all salary, benefits, rights, and seniority that Complainants would have enjoyed had they never been illegally discharged.  <u>Such reinstatement is not stayed by an objection to this order</u>.

October 6, 2022 final determination at p. 8 (emphasis added).

57.    Section 42121 of Title 49 of the United States Code provides, in Pertinent part, that:

If the Secretary of Labor concludes that there is a reasonable cause to believe that a violation of subsection (a) has occurred, the Secretary shall accompany the Secretary's findings with a

12

preliminary order providing the relief prescribed by paragraph (3)(B).  <u>Not later than 30 days after the date of notification of findings under this paragraph</u>, either the person alleged to have committed the violation or the complainant <u>may file objections to the findings or preliminary order, or both, and request a hearing on the record</u>.  <u>The filing of such objections shall not operate to stay any reinstatement remedy contained in the preliminary order</u>. . . . . If a hearing is not requested in such 30-day period, the preliminary order <u>shall be deemed a final order</u> that is not subject to judicial review.

49 U.S.C. § 42121(b)(2)(A) (2023) (emphasis added).

58.    ExxonMobil failed to file any motion to stay the preliminary reinstatement order of October 6, 2022.  Moreover, ExxonMobil has been in violation of the October 6, 2022 preliminary reinstatement order and has rejected all attempts by Complainants to obtain the ordered relief of preliminary reinstatement.

59.    The actual and/or suspected protected activity of Complainants was a contributing factor in ExxonMobil's decision to terminate their employment, respectively.

60.    ExxonMobil's unlawful treatment of Complainants as well as its refusal to fulfill the obligations it has pursuant to the October 6, 2022 preliminary reinstatement order relating to Complainants is intentional and in reckless disregard of Complainants' rights under law.

61.    As a direct and proximate result of the protected activities of Complainants under SOX, Complainants were terminated, a retaliatory personnel action, and have suffered, and continue to suffer, damages, including, but not limited to, lack of reinstatement by Respondent, loss of income, employment benefits, job advancement opportunities, mental anguish, emotional distress, personal humiliation, indignity, embarrassment, inconvenience, stigma, pain and suffering.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Complainants Lindsey Gulden and Damian Burch respectfully request

13

that the following relief be Ordered:

A.    Enter a declaratory judgment that ExxonMobil unlawfully violated Complainants' rights under law as well as an Order immediately reinstating Complainants to their positions, or to equivalent positions, with ExxonMobil with all rights of seniority and benefits;

B.    Enter judgment in favor of Complainants against the Respondent on their SOX claims and award to Complainants and against Respondent any and all damages for lost income (back and front pay if necessary) and other employment benefits as well as all other economic damages allowed for under SOX;

C.    Enter an award to Complainants and against Respondent for all compensatory damages and other damages allowed for under SOX;

D.    Enter a final order on an expedited basis finding that Respondent is in willful violation of the October 6, 2022 preliminary reinstatement order;

E.    Enter an award to Complainants and against Respondent for pre-judgment and post-judgment interest;

F.    Enter an award to Complainants and against Respondent for attorneys' fees, costs and disbursements associated with prosecution of this action; and

G.    Enter an award to Complainants and against Respondent for such additional relief as deemed appropriate.

*Signature Page to Follow*

14

Dated:  July 12, 2023                         Respectfully Submitted,


                                              */s/ Neil L. Henrichsen*
                                              Neil L. Henrichsen, DC Bar No. 420277
                                              HENRICHSEN LAW GROUP, P.L.L.C.
                                              1725 I Street, NW, Suite 300
                                              Washington, DC 20005
                                              Tele: (202) 423-3649
                                              Fax: (202) 379-9792
                                              nhenrichsen@hslawyers.com
                                              service@hslawyers.com


                                              */s/ Kadean Wilson*
                                              Kadean Wilson, FL Bar No. 1025221
                                              HENRICHSEN LAW GROUP, P.L.L.C.
                                              301 W. Bay Street, Suite 1400
                                              Jacksonville, FL 32202
                                              Tele: (904) 381-8183
                                              Fax: (904) 212-2800
                                              kwilson@hslawyers.com
                                              service@hslawyers.com


                                              */s/ Ronald P. Angerer, II*
                                              Ronald P. Angerer, II, B.C.S.
                                              FL Bar No. 0104874
                                              HENRICHSEN LAW GROUP, P.L.L.C.
                                              301 W. Bay Street, Suite 1400
                                              Jacksonville, FL 32202
                                              Tele: (904) 381-8183
                                              Fax: (904) 212-2800
                                              rangerer@hslawyers.com
                                              service@hslawyers.com


                                              **Attorneys for Complainants**

# EXHIBIT H

**UNITED STATES DEPARTMENT OF LABOR**

**OFFICE OF ADMINISTRATIVE LAW JUDGES**

**COVINGTON DISTRICT OFFICE**

*Issue Date: 11 April 2024*

*In the Matter(s) of*:

| | |
|---|---|
| **LINDSEY GULDEN** and **DAMIAN BURCH,** *Complainants*, | **OALJ NO(S).:  2023-SOX-00021  2023-SOX-00022** |
| v. | **OSHA NO(S).:  6-1730-21-120** |
| **EXXON MOBIL CORPORATION,** *Respondent*. | **PATRICK M. ROSENOW** District Chief Administrative Law Judge |

## RULING ON RESPONDENT'S MOTIONS TO UNJOIN AND DISMISS

These proceedings arise under employee protection provisions of the Sarbanes-Oxley Act of 2002, otherwise known as the Corporate and Criminal Fraud Accountability Act[1], (herein "SOX" or "the Act"), and its implementing regulations.[2] The Secretary of Labor is empowered to investigate and determine "whistleblower" complaints filed by employees of publicly traded companies who are allegedly discharged or otherwise discriminated against regarding the terms and conditions of their employment for providing information about fraud against company shareholders to supervisors, federal agencies, or members of Congress.

### Procedural Status

Complainants filed their initial complaints with the Occupational Safety and Health Administration (OSHA), alleging they had been unlawfully terminated by Respondent in violation of the Act. OSHA completed its investigation and issued a decision ordering Respondent, *inter alia*, to reinstate Complainants.[3] Respondent objected to the OSHA

---

[1] 18 U.S.C. § 1514A.
[2] 29 C.F.R. Part 1980.
[3] Complainants' subsequent action to enforce compliance with the OSHA reinstatement order was denied in the United States District Court of New Jersey and is on appeal to the United States Court of Appeals for the Third Circuit.

5100 Village Walk, Suite 200, Covington, Louisiana 70433
Telephone 985.809.5173 – email OALJ-Covington@dol.gov
https://www.dol.gov/agencies/oalj/contacts/COVINGTON

findings and requested a *de novo* hearing before OALJ. The cases were referred to me, and I issued an initial scheduling order. Pursuant to that order, Complainants filed a Bill of Particulars.[4] Respondent then filed an answer and motions to dismiss.

*Issues and Positions of the Parties*

Complainants' Bill of Particulars alleges in pertinent part that:

> Complainant Gulden holds a PhD in Geoscience and Complainant Burch holds a PhD in Physical Applied Mathematics. They were employed by Respondent, which holds a significant stake in the Delaware Basin, an area of West Texas and southern New Mexico known for including large oilfields. Complainants' duties included contributing to the analyzation and assessment of the future development of the Delaware Basin.

> In 2018, Respondent estimated the net present value (NPV) of the Delaware Basin holdings to be $60 billion. However, production in 2018 and 2019 was slower than expected and in 2019, Respondent's estimate of NPV was lowered to $40 billion. In April 2019, Respondent filed an SEC form indicating it anticipated producing more than one million oil equivalent barrels per day by as early as 2024 and that the current estimate of the resource base was approximately 10 billion oil equivalent barrels, but likely to grow. The form was consistent with statements Respondent released to the investor community.

> To match those representations, Respondent's management pressured the Delaware Basin Development Planning Team to modify the development plan to be consistent with the revised estimate. When reasonable planning assumptions failed to meet the estimate, management pressured employees to use more unreasonable estimates, which were fully inconsistent with actual historically based data, but drove the NPV to $50 billion.

> Complainant Burch objected to the use of the $50 billion NPV estimate. He also objected to using planning assumptions that were purposely misleading. Nonetheless, Respondent's Delaware Basin development manager, Melissa Bond, insisted on the use of those assumptions. Complainant Gulden forwarded to the supervisor of the planning team and to Complainant Burch her own conclusions that there was no objective and verifiable support for the estimates being used by Respondent.

> On 23 Oct 19, Bond conducted a Delaware Basin-wide meeting that included Complainant Burch and employees who would actually conduct the drilling. At the

---

[4] Complainants also filed with me a motion seeking a reinstatement enforcement order. I denied the motion, Complainants appealed to the Administrative Review Board (ARB), and the ARB denied the appeal as not proper for interlocutory consideration.

2

meeting, Complainant Burch described the assumptions used to generate the plan and one of the drillers objected that the data was impossible. Bond then interjected that Complainant Burch did not understand mathematical modeling and must have made a mistake.

Complainant Gulden then filed an internal verbal complaint about the matter with Tanya Miller of Respondent's Human Resources Department. Shortly after that, Complainant Burch also spoke to Miller, raising concerns about Bond's insistence on using false data. On 14 Nov 19, Complainant Burch forwarded emails corroborating his concerns to Miller's supervisor, Scott Clingman. Complainant Burch told Human Resources in writing that they were being asked to use unrealistic assumptions to increase the estimated NPV. Complainants' communications with Human Relations precipitated an internal investigation that continued through 2020 and reached upper management.

On 27 Aug 20, The Wall Street Journal contacted Respondent's Public and Government Affairs Department about an article it intended to publish about Respondent's development activities, expectations, and plans for the Delaware Basin. On 13 Sep 20, The Wall Street Journal published an article citing unnamed current and former employees to support the suggestion that Respondent increased the NPV for the Delaware Basin by overestimating how quickly it could drill. Respondent suspected Complainants to be the source of the article and initiated an investigation.

In October 2020, Rick McGovern, an investigator in Respondent's audit department, told Complainant Burch he was under investigation for sending emails from his business account to his personal email account in July of 2020. The reason given for the investigation was unrelated to Complainant Burch's Delaware Basin concerns or the newspaper article. Complainant Burch told McGovern the emails contained no proprietary or other company information and McGovern responded that the case was closed.

However, McGovern subsequently requested additional data from Complainant Burch's computer and conducted a follow-up meeting. Complainant Burch fully complied with all requests. McGovern instructed Complainant Burch not to discuss the investigation with anyone else in or outside of the company. Shortly thereafter, Complainant Burch noticed that his LinkedIn account had been viewed by the global head of Respondent's audit department. Complainant Gulden noticed the same thing about her account.

On 23 Oct 20, Respondent terminated Complainant Gulden, explaining it had lost confidence in her commitment to the company and had concerns that her values were not in conformance with those of the company.

On 10 Dec 20, Respondent terminated Complainant Burch, explaining that the termination was based partly on the investigation that commenced in October,

which determined that he forwarded company files to his personal email address and had modified as well as failed to disclose documents during the investigation. It also noted he had failed to cooperate with the investigation and had canceled one meeting with the investigators. Complainant Burch had canceled a meeting but to report retaliation to human resources. The final reason given for the termination was that Complainant Burch had very negative sentiments about company strategy.

In its answer to the Bill of Particulars, Respondent objected to any expansion of the statutory basis for the complaints to include both 18 U.S.C. § 1514A(a)(1) and (2), noting that the OSHA complaints expressly cited only (a)(1). It argued any complaint under (a)(2) would have no factual or legal basis and be time-barred. Respondent also argued that the cases are inappropriately joined, asserting that each of the complainants worked for different companies, had different supervisors, were terminated at different times by different discharge authorities, and were terminated for different reasons. Finally, Respondent's answer also established clear factual disputes between the parties.

Respondent then filed a Motion for Summary Dismissal of any complaint under 18 U.S.C. § 1514A(a)(2).[5] It argues that Complainant's failure to cite Subsection (a)(2) renders that part of any complaint untimely, noting that it was deprived of any opportunity to respond to an allegation of a Subsection (a)(2) violation. It also argues that the factual allegations in the Bill of Particulars are insufficient to state a cause of action as to Subsection (a)(2). Respondent also submits that (1) there is no allegation or evidence of any proceeding filed or about to be filed, (2) notwithstanding the OSHA findings, communications to the media are not protected activity within the meaning of the Act, and (3) in any event, Complainants do not allege as protected activity any communications to the media.[6]

Complainants respond that Respondent cannot argue it had no notice of a Subsection (a)(2) claim, because OSHA considered that subsection in its findings. They further argue that there is no indication that (1) they intended to confine their complaint to Subsection (a)(1) or (2) Respondent was answering only a Subsection(a)(1) complaint. Complainants continue that dismissal of their Section(a)(2) claim would be premature, as temporal proximity between The Wall Street Journal contact and subsequent article and their termination is clearly sufficient to defeat a summary decision motion as to causation. Complainants further suggest that Respondent's allegation that they were fired for their disclosures to The Wall Street Journal is subject to a reasonable question of material fact. Complainants also cite the OSHA findings. They argue that: (1) statements to the media constitute protected activity and (2) employees fired because of their employer's mistaken belief that they engaged in protected activity are protected under the Act. Finally, they

---

[5] The motion also revisited its opposition to trying the cases jointly.

[6] Respondent cites Complainants' denial to the OSHA investigator of having done so.

argue that there was indeed a proceeding, a class action lawsuit related to Respondent's Texas and New Mexico holdings brought in federal district court in September 2021.

In its reply, Respondent argues that the OSHA findings carry no weight, as the entire matter is brought *de novo* before the Office of the Administrative Law Judge. It reprises its argument that it was denied procedural due process by the absence of notice of a Subsection (a)(2) argument. Finally, it notes that at the time it took adverse action, it could not have known that a class action lawsuit would be brought almost a year later.

### Applicable Legal Standards

The statute provides that no covered company may take adverse action against an employee because the employee did a lawful act:

> (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by--
>> (A) a Federal regulatory or law enforcement agency;
>> (B) any Member of Congress or any committee of Congress; or
>> (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or
>
> (2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.[7]

To prevail, a SOX complainant must establish by a preponderance of the evidence that: (1) a complainant engaged in activity that SOX protects; (2) the respondent took an unfavorable personnel action against the complainant; and (3) the protected activity was a contributing factor in the adverse personnel action. If a complainant meets this burden of proof, the employer may avoid liability only if it proves its affirmative defense, which requires demonstrating by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected activity.[8]

---

[7] 18 U.S.C. § 1514A(a).
[8] *Williams v. QVC, Inc.*, ARB No. 2020-0019, ALJ No. 2018-SOX-00019, slip op. at 6 (ARB Jan. 17, 2023).

5

The statute further adopts the procedures set forth in the statute addressing air safety whistleblowers.[9] That statute provides that an aggrieved party may file a complaint with the Secretary of Labor, whose representative shall conduct an investigation and issue a preliminary order. Any party may file objections to those findings and request a hearing on the record.[10] On the record hearings are *de novo* proceedings conducted by Administrative Law Judges, who may not consider the OSHA findings.[11]

The regulations incorporate by reference procedural rules for hearings conducted under the Act. "Except as provided in this part, proceedings will be conducted in accordance with the rules of practice and procedure for administrative hearings before the Office of Administrative Law Judges, codified at subpart A, part 18 of title 29 of the Code of Federal Regulations."[12] Those rules provide that the "Federal Rules of Civil Procedure (FRCP) apply in any situation not provided for or controlled by these rules, or a governing statute, regulation, or executive order."[13] Those rules in turn allow for a dismissal of a complaint if all of the allegations in it are accepted as true and it still fails to state a claim on which relief may be granted.[14]

Because of differences in administrative and federal court whistleblower litigation, the ARB has held that the strict pleading standards required in federal court do not apply to a SOX whistleblower claim before OALJ.[15] Instead, a "fair notice" legal standard applies for facial challenges to whistleblower complaints.[16] A "sufficient statement of the claims need only provide (1) some facts about the protected activity, showing 'relatedness' to the laws and regulations of one of the statutes in our jurisdiction, (2) some facts about the adverse action, (3) a general assertion of causation and (4) a description of the relief that is sought."[17] "The ALJ should not dismiss a complaint for failure to state a claim until he or she has allowed the complainant a sufficient opportunity to amend or supplement the claim(s) contained in the complaint."[18]

---

[9] 18 U.S.C. § 1514A(b)(2).

[10] 49 U.S.C. § 42121(b)(1).

[11] 29 C.F.R. § 1980.107(b).

[12] 29 C.F.R. § 1980.107(a).

[13] 29 C.F.R. § 18.10(a).

[14] 29 C.F.R. § 18.70(c); Fed. R. Civ. P. 12(b)(6).

[15] *Sylvester v. Parexel Int'l, LLC,* ARB No. 07-123, ALJ Nos. 2009-SOX-039/042 (ARB May 25, 2011).

[16] *Evans v. U.S. Env't. Prot. Agency*, ARB No. 08-059, ALJ No. 2008-CAA-00003, slip op. at 9 (ARB July 31, 2012); *see also, McFadden v. Deutsche Bank/DB USA Core Corp.*, ARB No. 2022-0002, ALJ No. 2021-SOX-00023, slip op. at 4 (ARB. Jan. 26, 2022)(recognizing fair notice requirement, not heightened pleading standard, applies to SOX whistleblower complaints and is not a demanding standard).

[17] *Evans,* ARB No. 2008-0059, slip op. at 9.

[18] *Id.* at 12; *see also McFadden*, ARB No. 2022-0002, slip op. at 4-5 (reversing ALJ's dismissal of complaint on unopposed motion to dismiss without providing complainant leave to amend her complaint).

*Discussion*

The threshold procedural question is whether the two complaints should be adjudicated in a single proceeding. Respondent first argues that each of Complainants work for a separate company. However, it does not suggest that the caption needs to be changed to reflect separate respondent employers, leading to the conclusion that to the extent there are two separate employing entities, both are full subsidiaries of Respondent. Respondent also points out that Complainants had different supervisors, were terminated at different times by different discharge authorities, and were terminated for different reasons.[19]

It does appear from the materials submitted that Complainants did have different supervisors, worked in separate organizations, and were fired by different managers. Nonetheless, there are a central core of common facts and disputed issues. Moreover, this is essentially a bench trial, and I am confident there is minimal risk the factfinder will be confused and unable to compartmentalize the relevance of evidence to each complaint. Consequently, I find the interests of judicial efficiency substantially outweigh any possible prejudice. Respondent's motion is denied in that regard.

From a substantive standpoint, I first note that to the extent Complainants rely upon and cite the evidentiary review, factual findings, or application of law in the OSHA decision, that reliance and those citations are misplaced. OSHA's interpretations of regulations and the law, unlike those of the Administrative Review Board, are neither binding nor persuasive as this is a *de novo* review. The same is true for OSHA's recitation of any evidence or any factual findings.

Respondent's next argument is also effectively procedural, even though it may be seen as substantive, depending on how the statute of limitations is viewed. Respondent urges that any claim brought under Subsection (a)(2) would be untimely and must be dismissed as so. In their briefs, the parties focused on whether there was an expressed or implied inclusion of that subsection as part of the claim. That focus on technical language ignores the most material consideration, which is whether Complainants timely filed a claim which effectively communicated the factual and legal basis, notwithstanding whether both subsections were specifically cited or not.

Respondent makes no suggestion that Complainants changed any of the factual allegations in their complaints, but only that an expansion of the complaints to include Subsection (a)(2) would not only be untimely but deny it procedural due process notice. However, it is unclear what Respondent would have done differently had it understood that subsection was part of the complaints. Indeed, one of the few things it could have done would have been to argue the case differently to OSHA. Ultimately that would have made no

---

[19] I suspect Complainants would submit that they were fired for the same reason, notwithstanding Respondent's suggestion to the contrary.

difference, given that, in the event OSHA would have issued a different decision, Complainants could have objected and sought a *de novo* hearing. Respondent's motion to dismiss any part of the complaints based on Subsection (a)(2) for untimeliness and lack of due process for notice is denied.

The central substantive question is whether Complainants have successfully alleged a claim for which relief may be granted under Subsection (a)(2) of the Act. For the purposes of their motion, all factual allegations and fair inferences therefrom in the Bill of Particulars are assumed to be true.

Subsection (a)(2) clearly contemplates as a predicate for protected activity assistance "in a proceeding filed or about to be filed." It also requires that the employer be aware of such assistance, although that requirement is also implicit in a causation analysis. Respondent argues that nothing in the Bill of Particulars alleges or even allows for an inference that there was a proceeding filed or about to be filed. Complainants answer that argument by citation to the OSHA findings. However, even to the extent those findings could be found to be a rational conclusion based on an accurate statement of law, they are of no weight in this *de novo* proceeding.[20]

Although they did not include it in their Bill of Particulars,[21] in their answer to the motion, Complainants alleged that on 10 Sep 21, a class-action suit alleging misstatements and omissions concerning Respondent's holdings in areas including the Delaware Basin region was filed against Respondent. Complainants argue that Respondent could have anticipated The Wall Street Journal articles could have precipitated this September 2021 class-action suit. Complainants submit that such anticipation is sufficient to satisfy the proceeding requirement of Subsection (a)(2). Complainants cite an ALJ Clean Air Act decision in support of that position.[22]

However, the ALJ decision is not binding, and I find its facts to be significantly different. In this case, Complainants allege no communication to The Wall Street Journal, much less an environmental activist. Instead, the allegations in this Bill of Particulars would require

---

[20] To be clear, that does not prevent a party from adopting those conclusions or interpretations of the law as part of their own argument, which is then given due consideration. To the extent that is the case in this instance, I have considered the arguments and address them to the extent necessary in the main body of this ruling.

[21] Given Complainants' position that the September 2021 class action suit is a basic predicate for their Subsection (a)(2) claim, its omission from the Bill of Particulars was significant. While the requirement for a Bill of Particulars is designed to avoid a "make it up as we go along" approach to litigation, there should be little factual question as to the actual existence and timing of such a suit. Moreover, given the relatively early stage of litigation there should be little prejudice to Respondent from accepting the allegation of the suit as an amendment to the Bill of Particulars.

[22] *Ferguson v. Weststar, Inc.*, 1998-CAA-9 (ALJ Jan. 27, 2000) (Incorrectly cited in brief as 1999-CAA-9.) In *Ferguson*, the complainant communicated his environmental concerns to his environmental activist neighbor, who then emailed government agencies, which in turn started a proceeding. The judge found the complainant had caused a proceeding to be filed, citing 1995 and 1980 environmental Secretary decisions *Scott v. Alyeska Pipeline Service Co.*, 92-TSC-2 (Sec'y July 25, 1995), and *Wedderspoon v. City of Cedar Rapids*, 80-WPC-1 (Sec'y July 28, 1980).

that Respondent could have foreseen that the internal communications made by the Complainants would somehow lead to other parties disclosing information to The Wall Street Journal, which in turn would eventually lead to the proceeding of a class-action lawsuit.

I find the Bill of Particulars, even with the amendment as noted, fails to allege any proceeding filed or about to be filed. Accordingly, the complaints as to Subsection (a)(2) are dismissed.[23] The case will proceed for adjudication on the Subsection (a)(1) complaints. The parties will consult to discuss a schedule for further litigation and either submit a joint proposed scheduling order or arrange for a conference call within 10 days of receipt of this order.

**ORDERED** this 11th day of April, 2024, at Covington, Louisiana.

**PATRICK M. ROSENOW**
District Chief Administrative Law Judge

---

[23] A clear, but adjunct, issue peripherally discussed by the parties is whether communication to the media is a protected activity. Given that no one is alleging such an action in this case, the issue is not yet ripe, although it appears it may well become relevant in the context of whether an employee who is wrongly suspected of protected activity and terminated as a result is protected under the Act.

# **EXHIBIT I**

### UNITED STATES DEPARTMENT OF LABOR

### OFFICE OF ADMINISTRATIVE LAW JUDGES

### COVINGTON DISTRICT OFFICE

*Issue Date: 02 July 2024*

*In the Matter(s) of*:

| | |
|---|---|
| **LINDSEY GULDEN AND**<br>**DAMIAN BURCH,**<br>　　　　*Complainants*, | **OALJ NO(S).:**　**2023-SOX-00021**<br>　　　　　　　　　**2023-SOX-00022** |
| | **OSHA NO(S).:**　6-1730-21-120 |
| 　　v. | |
| **EXXON MOBIL CORPORATION,**<br>　　　　*Respondent*. | **PATRICK M. ROSENOW**<br>District Chief Administrative Law Judge |

## ORDER DISMISSING CASE

　　These proceedings arise under the Sarbanes-Oxley Act of 2002, otherwise known as the Corporate and Criminal Fraud Accountability Act[1], (herein "SOX" or "the Act"), and the regulations promulgated thereunder[2], which are employee protective provisions. On 1 Jul 24, Complainants filed a Notice of Filing of Complaint and Notice of Removal to the United States District Court and provided a copy of the federal court filing. Pursuant to the filing of this action in federal court, this case is administratively closed and dismissed from this office.

　　**ORDERED** this 2nd day of July, 2024, at Covington, Louisiana.

**PATRICK M. ROSENOW**
District Chief Administrative Law Judge

---

[1] 18 U.S.C. § 1514A.
[2] 29 C.F.R. Part 1980.

5100 Village Walk, Suite 200, Covington, Louisiana 70433
Telephone 985.809.5173 – email OALJ-Covington@dol.gov
https://www.dol.gov/agencies/oalj/contacts/COVINGTON